Medical Arts Hospital of Dallas v. Commissioner.
Medical Arts Hosp. of Dallas v. Commissioner
Docket No. 108768.
United States Tax Court
1943 Tax Ct. Memo LEXIS 347; 1 T.C.M. (CCH) 935; T.C.M. (RIA) 43189; April 22, 1943
*347 George S. Atkinson, Esq., Dallas Nat'l Bank Bldg., Dallas, Tex., and J. R. Nelson, C.P.A., for the petitioner. Frank B. Appleman, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: Respondent has determined that petitioner is liable for a deficiency in its income tax for the year 1939 in the sum of $5,353.35 under section 102, Internal Revenue Code. Petitioner's liability under this section is the only issue in the case. Findings of Fact The facts stipulated by the parties are hereby found accordingly. They, together with facts found from the evidence adduced at the hearing, disclose the following: Petitioner was chartered under the laws of the State of Texas on January 5, 1938, for the purpose of "the erection, maintenance, conduct and control of a sanitarium." It took over the operation of a sanitarium or hospital which had previously been operated as the Medical Arts Diagnostic Center, Inc., in Dallas, Texas. Petitioner kept its books on the accrual basis and filed its returns with the collector of internal revenue for the second collection district at Dallas, Texas. The Cary-Schneider Investment Company, hereinafter called the Investment *348 Company, was chartered under the laws of the State of Texas on January 23, 1922. Its purpose, as stated in its charter, was as follows: * * * for the erection or repair of any building or improvement, and the accumulation and loaning of money for said purposes, and for the purchase, sale and subdivision of real property in towns, cities and villages, and their suburbs not extending more than two miles beyond their limits and for the accumulation and loaning of money for that purpose. The Investment Company owns and operates a large building in Dallas known as the Medical Arts Building. In the year 1939 the building was occupied by physicians, dentists, optical offices, and related enterprises, and petitioner which operated a hospital on the 17th, 18th, and 19th floors of the building. The hospital had about 86 beds, practically all of which were in private rooms. The stock of petitioner from January 5, 1938, to December 31, 1939, was owned as follows: Dr. E. H. Cary
140 shares
E. H. Cary, Jr
5 shares
George L. Moore
5 shares
Total
150 shares
The stock of the Investment Company on the dates indicated was owned as follows: January 1, 1938 to
May 5, 1938 to
July 5, 1939 to
May 4, 1938
July 4, 1939
Dec. 31, 1939
Common
Preferred
Common
Preferred
Common
Preferred
Dr. and Mrs. E. H. Cary
12,580
2,540
11,260
2,276
8,860
2,268
* E. H. Cary, Trustee for his
four children
7,300
1,460
8,620
1,724
11,020
1,732
Dr. C. N. Rosser
50
50
50
Dr. A. I. Folsom
50
50
50
Geo L. Moore
20
20
20
Total Capital Stock
20,000
4,000
20,000
4,000
20,000
4,000
*349 On January 25, 1922, the Investment Company executed a trust deed by which it assigned and conveyed to a trustee to secure a bonded indebtedness of $900,000 the land on which the Medical Arts Building was located "together with any and all buildings, improvements and appurtenances now standing, or at any time hereafter constructed or placed upon said land, or any part thereof, including all boilers, dynamos, motors, screens, curtain fixtures, window shades, wall beds, ice boxes, ranges, furnaces, vacuum cleaners, refrigerators, heating, plumbing, ventilating, gas and electric light fixtures, elevators and fittings, and machinery, appliances, plants, apparatus and fittings and fixtures of every kind in, or that shall be placed in, any building or buildings now or hereafter standing on said premises or any part thereof." At that time the construction of the Medical Arts Building was contemplated. The building was completed in 1923, an annex built in 1927, and the building was air-conditioned in 1937. In 1928 the Investment Company equipped certain space in the building *350 for a diagnostic center, which later became a hospital or sanitarium. The Medical Arts Diagnostic Center, Inc., filed its charter on August 28, 1928, which declared that it was formed for benevolent and charitable purposes, "especially for the maintenance of a hospital * * * at which members of the corporation will administer to the sick, infirm and afflicted, of all creeds and nations * * *." It was provided that the corporation should exist for a term of 50 years; that it should have no capital stock; that its members were Dr. Cary, George L. Moore, and Clarice Dudley, who had been operating a hospital and diagnostic center, all of the equipment and properties of which were placed in trust by them for the charitable purpose. The Medical Arts Diagnostic Center, Inc., had no assets, kept no books, had no bank account and prior to 1938 all of its income and deductions were reported by the Investment Company. For 1937 income in the amount of $181,113.98 and deductions in the amount of $60,386.20 of the hospital were reported by the Investment Company. Depreciation on the equipment in the hospital was also claimed by the Investment Company. It paid a tax for 1937. The Medical Arts Diagnostic *351 Center, Inc., was dissolved on January 5, 1938, when petitioner was chartered. Prior to 1939 the Investment Company had refinanced its bonded indebtedness created in 1922, increasing the indebtedness, giving deeds of trust on the lot and building and extending the lien securing the bonded indebtedness originally in the amount of $900,000. At the beginning of the year 1939 its indebtedness was $1,399,999.98, secured as above set out. In the year 1939 the Investment Company paid $143,333.42 on this indebtedness, leaving a balance at the end of 1939 of $1,256,666.58. The Investment Company was not in default during 1938 or 1939 on either the principal or interest due on the indebtedness. In December, 1938, petitioner purchased from the Investment Company furniture and fixtures in the hospital for the book value of $11,045.63. Petitioner paid the same rent for the three floors of the building which it occupied and used as a hospital that other tenants would have paid for the space. For the years 1938 and 1939 it paid an annual rental of $41,832.36. For 1938 and 1939 the Investment Company and petitioner each filed its own income tax returns and reported its own income. In 1938 petitioner *352 advanced to the Investment Company the sum of $19,000 against which was credited the purchase price of the above-mentioned furniture and fixtures, leaving a net balance due petitioner of $7,954.37 at the end of the year 1938. In 1939 petitioner advanced the Investment Company the sum of $24,000 against which was credited the amount of $1,180.74 which consisted of collections on accounts receivable originating prior to January 1, 1938, and insurance premiums paid in 1939 by the Investment Company for petitioner's benefit, leaving a net balance due petitioner at the end of the year 1939 of $30,773.63. Both of the loans in 1938 and 1939 were made without any charge for interest and without any written evidence of indebtedness. The Investment Company placed the moneys advanced to it by petitioner in 1939 in its general bank account, together with its other funds and drew on the account to pay its obligations and expenses of every character and to make the payments which were charged to the personal account of Dr. Cary, as hereinafter related. Dr. Cary and his wife also pledged their personal assets in order to finance the building and at times borrowed money for such purposes. In financing *353 the building and enterprise and in payment for the stock, there was charged from 1922 to 1938, inclusive, to Dr. Cary on the books of the Investment Company $310,090.43, composed of $260,077 cost of Investment Company stock and $68,012.69 personal withdrawals, less a net $18,000 bank advance to which reference is hereafter made. Dr. and Mrs. Cary endorsed notes of the Investment Company. In the year 1938 Dr. Cary borrowed $60,000 which was put into the bank account of the Investment Company. This amount was credited to the personal account of Dr. Cary by the Investment Company. In 1938 the company paid $42,000 of this note and charged the payments to Dr. Cary's account, leaving an unpaid balance of $18,000. In 1939 the company paid this balance. In the year 1939 Dr. Cary's personal account on the books of the Investment Company was credited with $31,224.18 and charged with $15,638.35. Mrs. Cary withdrew from the Investment Company on November 6, 1939, $4,500 which was repaid January 3, 1940. Petitioner and the Investment Company neither declared nor paid any dividends for the years ending December 31, 1938, and December 31, 1939. A summary of petitioner's profit and loss statement *354 as of December 31, 1938, is as follows: Income: Patients' Accounts
$197,789.00
Expenses: Services to Patients: Salaries
$ 45,155.75
Supplies
32,264.66
Total
$77,420.41
Food
36,180.56
Total Service and Food cost
$113,600.97
General Expenses (including $41,832.36 Rent)
67,751.07
Total Expenses
181,352.04
Net Profit for 1938
$ 16,436.96
A summary of petitioner's profit and loss statement as of December 31, 1939, is as follows: Income: Patients' Accounts
$210,946.34
Coca Cola Sales
134.70
$211,081.04
Expenses: Services to Patients: Salaries
$ 44,189.79
Supplies
29,762.66
Total
$ 73,952.45
Food
36,507.33
Total Service and Food cost
$110,459.78
General Expense (including $41,832.36 Rent)
79,207.84
Total Expenses
189,667.62
Net Profit for 1939
$ 21,413.42
A summary of petitioner's balance sheet as of December 31, 1938, is as follows: Assets
Current Assets
Cash
$ 535.78
Accounts Receivable - Patients
6,917.81
Cary-Schneider Investment Co. general account
7,954.37
Lewis Taylor
20.00
Total Current Assets
$ 15,427.96
Equipment (less depreciation reserve)
12,639.95
Total Assets
$ 28,067.91
Liabilities
Current Liabilities
Accounts Payable
$ 4,487.50
Cary-Schneider Investment Co. Current Account
717.53
Income Taxes - 1938
2,588.57
Social Security - Taxes
728.99
Property Taxes
50.36
$ 8,630.95
Capital and Surplus
Capital Stock
$ 3,000.00
Surplus - Profit 1938
16,436.96
Total Capital and Surplus
19,436.96
Total
$28,067.91
*355 A summary of petitioner's balance sheet as of December 31, 1939, is as follows: Assets
Current Assets
Cash
$ 1,183.84
Accounts Receivable - Patients
6,351.75
Cary-Schneider Investment Co.
Advance account
$31,954.37
Current account
(1,180.74)
30,773.63
Total Current Assets
$ 38,309.22
Equipment (less depreciation reserve)
11,760.81
Total Assets
$ 50,070.03
Liabilities
Current Liabilities
$ 9,219.65
Capital and Surplus
Capital Stock
$ 3,000.00
Surplus - Profit 1938
$16,436.96
Profit 1939
21,413.42
27,850.38
Total Capital and Surplus
$ 40,850.38
Total Liabilities
$ 50,070.03
A summary of the Investment Company's profit and loss statement for 1938 is as follows: Income: Rent from Building
$396,115.06
Light and Water Sales
3,401.11
Profit - Barber Shop
38.83
Collections - 1937 Hospital Accounts
3,363.41
Total Income
$402,918.41
Operating Expenses: Salaries - Administrative
$ 17,500.00
Other Salaries
58,773.98
Total Salaries
$ 76,273.98
Other Expenses
94,183.63
Total Operating Expenses
170,457.61
Net profit from operations
$232,460.80
Interest, Taxes, etc.: (Including interest and discount on mortgage loans, $60,923.32 and
current interest and discount $7,883.54)
115,766.49
Net Profit Before Depreciation
$116,694.31
Depreciation
66,441.53
Net Profit to Surplus
$ 50,252.78
*356 A summary of the Investment Company's profit and loss statement for 1939 is as follows: Income: Rent from Building
$401,742.00
Light and Water Sales
3,712.08
Profit - Barber Shop
232.66
Collections - Old Hospital Accounts
269.65
Dr. Extras
1,367.86
Sale of Fans
902.00
Coca Cola Sales
171.65
Total Income
$408,397.90
Operating Expenses: Salaries - Administrative
$ 17,470.00
Other
61,523.09
Total Salaries
$ 78,993.00
Other Expenses
76,147.09
Total Operating Expenses
$155,140.18
Net Profit from Operations
$253,257.72
Interest, Taxes, etc. (Including interest and discount on mortgage loans, $60,923.32 and
current interest $9,592.15)
121,872.84
Net Profit Before Depreciation
$131,384.88
Depreciation
61,956.48
Net Profit for Year
$ 69,428.40
A summary of the Investment Company's balance sheet as of December 31, 1938, is as follows: Assets
Current Assets: Cash
$ 499.91
Accounts and Notes Receivable - Tenants (less re-
serve for losses)
21,334.71
Other Accounts Receivable
1,329.29
Total Current Assets
$ 23,163.91
Fixed Assets: Real Estate: Land and Building and Equipment Minus Depreciation
1,770,734.74
Other Assets
18,310.52
Dr. E. H. Cary - Personal Account
310,090.43
Total
$2,122,299.60
Liabilities
Current Liabilities: Medical Arts Hosp. of Dallas
$ 7,954.37
Accounts Payable
1,757.34
Notes Receivable Discounted
5,384.22
Republic National Bank - Barber Shop Account O.D.
48.31
Accrued Interest - First Mortgage Loan
25,000.00
Accrued Interest - Indenture with Republic National
Bk.
4,583.30
Accrued Taxes
25,756.12
Maturities in 1939 on Fixed Indebtedness
110,000.00
Total Current Liabilities
$ 180,483.66
Fixed Indebtedness (After deduction of $110,000 Maturities for 1939)
$1,289,999.98
Endowment Fund Reserve
1,000.00
Capital and Surplus
Stock authorized and outstanding: Preferred
$400,000.00
Common
25,000.00
Total
$ 425,000.00
Surplus
Balance - 1/1/38
$175,563.18
Profit and Loss (1938)
50,252.78
225,815.96
Total Capital and Surplus
650,815.96
Total
$2,122,299.60
*357 $
A summary of the Investment Company's balance sheet as of December 31, 1939, is as follows: Assets
Current Assets: Cash
$ 733.69
Accounts and Notes Receivable -
Tenants (less reserve for losses)
13,335.56
Other Accounts Receivable
579.08
Total Current Assets
$ 14,648.33
Fixed Assets: Real Estate: Land and Building and Equipment Minus Depreciation
1,721,102.26
Other Assets
13,151.57
Dr. E. H. Cary: Personal Account
$ 312,504.60
4,500.00
317,004.60
Total
$2,065,906.76
Liabilities
Current Liabilities: Accounts Payable
$ 2,803.69
Notes Receivable Discounted
1,889.00
Accrued Interest - First Mortgage Loan
23,750.00
Accrued Interest Indenture
2,673.61
Medical Arts Hospital of Dallas
30,773.63
Accrued Taxes
26,050.84
Maturities in 1940 on Fixed Indebtedness
112,500.00
Total Current Liabilities
$ 200,440.77
Fixed Indebtedness (After deduction of $112,500 Maturities for 1940
1,144,166.58
Capital and Surplus: Stock Authorized and Outstanding: Preferred
$400,000
Common
25,000
Total
$ 425,000.00
Surplus: Balance - Jan. 1
$225,815.96
Depreciation Adjust. 1938
1,375.04
Profit and Loss 1939
69,428.40
$296,619.40
Loss: 1938 Income Tax Adjustment
319.99
Surplus December 31, 1939
296,299.41
Total Capital and Surplus
$ 721,299.41
Total
$2,065,906.76
*358 Dr. Cary and his wife filed separate income tax returns for the years 1938 and 1939, reporting their income on the community property basis. Each reported and paid a normal tax of $525.14 and a surtax of $622.81 for 1938. Each reported and paid a normal of $638.47 and a surtax of $929.80 for 1939. If petitioner had distributed its earnings and profits for 1939 as dividends, Dr. Cary and his wife each would have had to pay an additional surtax for 1939 of $1,703.22 or a total additional surtax of $3,406.44. Petitioner permitted its earnings and profits for 1939 to accumulate instead of being divided or distributed. The earnings and profits so accumulated were beyond the reasonable needs of petitioner's business. Petitioner's shareholders avoided surtax by petitioner's failure to divide or distribute its earnings and profits for 1939. Petitioner in 1939 was availed of for the purpose of preventing the imposition of surtax on its shareholders through the medium of permitting its earnings and profits to accumulate instead of being divided or distributed. Opinion Viewed realistically, the principal distinction between the present facts and those found sufficient to justify applying *359 the statutory predecessor of section 102, Internal Revenue Code, in Helvering v. Chicago Stock Yards Co., 318 U.S. 693, 87 L. Ed. 1086, 63 S. Ct. 843, is their respective magnitudes. Petitioner's transactions may have been in the thousands, where those of the taxpayer in the Stock Yards case ranged into the millions; but proportionately, the relationships are similar, and there is no suggestion that mere size alone should lead to an opposite result. There are other distinctions, but we regard them as, if anything, unfavorable to the present petitioner. We are confronted here with the now familiar situation of a dominant individual who as stockholder controls different enterprises. The resources of the one are employed to advance the interests of another. But, unlike the situation in the Stock Yards case, the business connection between them here is actually insubstantial; the significance of their relationship arises rather from the common direction which they both receive. The advantage accruing to that common directing force by such an interplay between the two enterprises may be self-evident. By the same token so is the related advantage which the individual secures *360 through reduction of his putative tax obligations. See Trico Products Corp., 46 B.T.A. 346. In the present situation the ground assigned for accumulating petitioner's earnings is that they were needed to finance the Investment Company, an undertaking which was apparently the chief commercial pre-occupation of petitioner's principal stockholder. Again, unlike the ventures in the Stock Yards case, it is not clear that the Investment Company was actually in need of such assistance. Its financial statements indicate a prosperous, solvent, and increasingly successful enterprise, with substantial earnings which were also being industriously plowed back. But assuming that it required cash for purposes of intermediate financing, and assuming that loans from friendly sources might have been more advantageous to it than resort to usual banking channels, there is still no escape from the natural and by now stereotyped rejoinder that there was no reason for the funds to come from petitioner, rather than from petitioner's principal stockholder. Helvering v. National Grocery Co., 304 U.S. 282, 82 L. Ed. 1346, 58 S. Ct. 932; Helvering v. Chicago Stock Yards Co., supra; *361 Stanton Corp., 44 B.T.A. 56, 80. On the face of things, in fact, there would seem to be less. For this dominant stockholder was indebted to the Investment Company to the tune of about $50,000, a sum approximately half again as much as the total advanced by petitioner in the two years covered by this record. If that individual had received in dividends what petitioner loaned in those same years, and had in turn reduced his own obligations to the Investment Company in an equivalent amount, the books of the latter would have reflected the more favorable position of a reduction in loans receivable rather than an increase in loans payable, the Investment Company's cash position would have been identical, petitioner would have been no worse off, and the only difference in the ultimate result would have been an income tax obligation on petitioner's controlling stockholder which the present procedure eliminated. If that was the true purpose of the transaction, it goes without saying that it did not constitute a reasonable need of petitioner's business. The acknowledgment of such an object would, on the contrary, at once expose petitioner to the thrust of the *362 section which respondent is seeking to invoke. Yet no other reason for the manner in which the matter was handled is suggested. For these reasons, and upon a survey of all the circumstances, we have found as a fact that petitioner's earnings and profits were permitted to accumulate in lieu of being divided or distributed, that such accumulation was beyond the reasonable needs of petitioner's business, and that this action had the purpose of preventing the imposition of surtax upon the stockholders of petitioner. It follows, of course, that respondent committed no error. Decision will be entered for respondent. Footnotes
*. A trust was created in 1935 by Dr. E. H. Cary and Mrs. E. H. Cary for the benefit of their four children.↩