Gibbs & Cox, Inc. v. Commissioner.
Gibbs & Cox, Inc. v. Commissioner
Docket No. 110230.
United States Tax Court
1943 Tax Ct. Memo LEXIS 140; 2 T.C.M. (CCH) 688; T.C.M. (RIA) 43400; August 26, 1943
*140 1. Petitioner is a personal service corporation all of the stock of which is owned by two brothers. It began the year 1938 with capital and surplus of nearly $300,000, and cash on hand of approximately $470,000. This was adequate to cover its working capital needs during the next three years in the manner in which the business was conducted. Petitioner distributed no dividends during 1938, 1939 or 1940, but accumulated its net earnings for those years, aggregating approximately $600,000. This amount was never used in the business and was not needed for the business. Held, petitioner's earnings were permitted to accumulate beyond the reasonable needs of its business in 1938, 1939 and 1940, and petitioner was availed of to prevent the imposition of surtaxes upon its shareholders. Section 102 of the Revenue Act of 1938 and the Internal Revenue Code. 2. Petitioner received payments on a "good performance" bonus in the spring of 1937 for services rendered in designing vessels. Shortly thereafter a defect appeared in one of the vessels. Petitioner was not responsible for the defect, and the payors of the bonus never suggested that petitioner was not entitled to the bonus or that any *141 part of it should be returned. Held, petitioner must report on its 1937 tax return the bonus payments received in that year. 3. Petitioner was not on the accrual basis. It deducted excess profits tax on its books only when the tax was actually paid. Held, the record does not show that the Commissioner erred in allowing a deduction for excess profits tax only in the year in which said tax was actually paid, rather than in the year it accrued. Thomas G. Chamberlain, Esq., Hugh Satterlee, Esq., Edward J. Willi, Esq., 55 Liberty St., New York City, N. Y., and I. Herman Sher, Esq., 30 Broad St., New York City, N. Y., for the petitioner. Harold D. Thomas, Esq., for the respondent. ARUNDELL
Memorandum Findings of Fact and Opinion Petitioner contests the correctness of respondent's determination of income tax deficiencies for the calendar years 1937 through 1940 in the respective amounts of $30,471.38, $41,512.33, $69,460.49 and $60,370.76, and of an excess profits tax deficiency in the sum of $5,805.06 for the year 1937. The principal ground of complaint is the Commissioner's holding that petitioner is subject to the surtax imposed by section 102 of the Revenue Acts of 1936 *142 and 1938 and the Internal Revenue Code, due to an alleged unreasonable accumulation of surplus with a purpose to prevent the imposition of surtaxes upon stockholders. Two minor issues are also involved: (a) whether an item of $56,575.11 should have been included in gross income when received in 1937, and (b) whether, in computing net income for each year, petitioner should have deducted the excess profits tax that accrued for that year or, on the other hand, the excess profits tax that was actually paid during such year on account of the preceding year. The returns were filed in the second district of New York. Findings of Fact 1. William Francis Gibbs and Frederic H. Gibbs, brothers, are naval architects and marine engineers and have engaged in the business of naval architecture and marine engineering since before the first world war. In that war they were employed by the Shipping Control Committee, operating ships back and forth to France. W. F. Gibbs attended the peace conference in Paris as an American shipping expert. Upon termination of the war W. F. Gibbs became the Chief of Construction and F. H. Gibbs the Assistant Chief of Construction of the International Mercantile Marine *143 Company. In 1922 the Gibbs brothers were asked by the Government to undertake the reconditioning of the Leviathan. For that purpose they organized a corporation called Gibbs Brothers, Inc., which performed the work on the Leviathan and also services for other clients. Some projects, for which they prepared design for the United States Shipping Board, were abandoned and the ships never built. By 1929 business was poor. Gibbs Brothers, Inc. was in competition with three large shipbuilders, Newport News, Fall River and New York Shipbuilding Corporation, which had design staffs of their own. Daniel H. Cox was a member of the firm of Cox & Stevens, Inc., which had been engaged in yacht designing, and in 1929 there were prospects of securing work from wealthy individuals who were building yachts. The Gibbs brothers and Cox, on June 29. 1929, organized Gibbs & Cox, Inc., petitioner herein, under the laws of New York, with broad powers relating largely to marine engineering and designing, including the right to carry on the business of naval architects and marine engineers and the designing of all kinds of ships and boats. Each of the three individuals subscribed for 100 shares of stock *144 and paid $10,000 in cash therefor. The new corporation took over the unfinished work of Gibbs Brothers, Inc. Cox became President, W. F. Gibbs Vice-President and F. H. Gibbs, Vice-President and Treasurer, which positions they still hold. At the present time W. F. Gibbs is also Controller of Shipbuilding, the purpose being to coordinate the shipbuilding programs of the Army and Navy and Maritime Commission. In 1938, for personal reasons, Cox surrendered his stock to the corporation, which paid him $40,000 therefor. No other change has occurred in the stockholdings. From 1929 to 1933 petitioner was engaged in designing yachts and merchant ships with an organization of from about 20 to 40 people and by 1933 it had little business. In that year the petitioner was approached by the United States Navy with respect to producing naval designs, which petitioner had not done before. Officials of the Navy stated that the designs then being submitted were antiquated. The Navy awarded contracts for destroyers to Federal Shipbuilding Corporation, Bath Iron Works and United Drydocks, Inc., hereinafter known by the first word of their respective corporate names, and also prepared to build vessels *145 of the same design in several Navy yards. At the Navy's request petitioner was named designing agent for such vessels. As a result of this Navy project, the petitioner made a contract dated October 5, 1933, with United, Federal and Bath to do the design work for the entire project. United and Federal had never built naval vessels before and Bath had built none since the first world war. United and Bath had no design staffs. The contract with the shipbuilding companies, commonly called four-party agreement, involved the supervision by the petitioner of a large design staff. Under the auspices of the shipbuilding companies a design department was organized called United Design Department of United Drydocks, and the petitioner acted in conceiving and supervising the designs made in that office. The organization comprised originally about 200 men and increased to about 350. It was located at 11 Broadway, New York, and was distinct from the petitioner's own staff at 1 Broadway. The employees of the United Design Department were hired in the name of United and paid by it. The petitioner had no responsibility for the payment of the wages or any other expenses of the United Design Department. *146 During the life of the four-party agreement, which expired on November 30, 1935, the principal activity of the petitioner was directing the work of the United Design Department, but it also did other work through its own staff at 1 Broadway. The designs which the petitioner developed were novel and radical. At the time of the termination of the four-party agreement in November 1935 there was design work still to be done on the destroyers, and the petitioner was approached with reference to a different arrangement with the shipbuilding companies. Federal and Bath desired the petitioner to continue the work on the uncompleted destroyers and on other destroyers for which they had received orders and the designs for which had been placed in the United Design Department. The two shipbuilding companies were anxious for the petitioner to be substituted in place of the United Design Department. Such substitution would mean the employment by the petitioner of substantially the same number of employees as in the United Design Department, which at that time exceeded 300. When that proposal was broached the petitioner made it clear to both Bath and Federal that it was incapable of financing *147 any such operation as the United Design Department. At the instance of Federal and Bath an arrangement was worked out whereby petitioner would assume responsibility for the pay roll and other costs incurred by it, the agreement being that Federal would promptly remit to petitioner amounts equal to its expenditures for pay roll, rent and other operating costs. Bath was to contribute sums to Federal to assist in this purpose. In accordance with this agreement petitioner employed on its own account a design staff comparable to the United Design Department and rented space at 21 West Street, to which the staff was moved. It employed all the personnel and assumed responsibility for all costs involved. When pay rolls, rents and other costs became due petitioner paid them. Pursuant to the agreement with Federal that company, within a few days after payment by petitioner, would remit to petitioner the amounts of pay rolls, rents and other costs with reference to the operation of the staff at 21 West Street. When petitioner began its Navy work in 1933 its services were unique in that it prepared all the working plans for a ship. Up to that time the average naval architect had prepared what *148 are known as contract plans and specifications, a brief outline of what the ship is to be, but the actual detailed working plans were made by the shipyard that got the contract. A number of plans are necessary for each ship. Each plan produced by petitioner is submitted to the Government and approved by it before it is sent to the shipyards. In the case of a destroyer there are about 1,500 plans; a merchant ship requires about 500 plans. In addition to the actual working plans of the ship, petitioner also undertook the job of purchasing the material and equipment. The contracts of purchase are let in the names of the clients of petitioner by the petitioner as agent. Petitioner is not responsible for payment, but is responsible for due care and ability in making the purchases. At the present time an ordinary day's output of blueprints from petitioner's office to the shipyards is from 7,500 to 10,000. Petitioner's organization is highly skilled. It maintains a school training section. Its staff is by far the largest independent engineering organization in the world. Prior to the termination of the four-party contract at the end of 1935 the largest number of employees petitioner ever *149 had was 45. In December 1935, following the creation by petitioner of its design organization in substitution of the United Design Department, petitioner had 364 employees. That number grew to 443, 487, 486, 582, 799, 1,318 and 2,356 at the end of the respective years 1936 to 1942, inclusive. Practically all of these employees are hired on a weekly salary basis. There are no written contracts of employment. The number of employees (including officers) for the last week of each of the years 1937 to 1941, inclusive, and the compensation rate per year were as follows: Compensation
rate per year
1937
1938
1939
1940
1941
Less than $1,800
207
190
265
421
632
$1,800 to $2,500
101
112
118
112
175
$2,500 to $3,000
101
90
94
77
116
$3,000 to $4,000
46
57
69
137
173
$4,000 to $5,000
13
17
18
45
153
$5,000 to $6,000
3
4
6
9
78
Over $6,000
9
11
12
14
54
Total for last week
of year
480
481
582
815
1,381
In addition to the naval work which started in 1933 and continuously increased, petitioner was employed in 1939 to design and procure the materials for a group of British merchant ships. That was followed late in 1940 by a contract with *150 the Maritime Commission to design the first 312 Liberty ships. Subsequently the Navy required combatant tank landing craft. Meanwhile, the number of yards that were building ships and destroyers had been increased. In 1937 petitioner was working on designs for more than 100 ships, in 1938 around 150, in 1939 about 200 or 250, in 1940 approximately 500 or 600, and in 1941 still a greater number. At the time of the trial herein petitioner had in its office about 40 projects, representing approximately 70 per cent of all the shipbuilding in this country. The ships that petitioner has designed are being built in 70 shipyards in the United States. Whenever the Navy has a difficult job to do, as tank landing craft, it is given to the petitioner. Because of the size of petitioner's organization the shipbuilding companies and the Government for several years past have come to depend upon it for designs. During the taxable years petitioner had no idea of changing the type or nature of its business. The figures in the following table reflect the expansion in petitioner's business: Total Expenses
Net
Before Federal
Salaries
Income
Gross
Income and
and
Per
Year
Income
Profits Taxes
Wages
Returns
1929
$ 56,995.21
$ 54,986.66
$ 42,125.46
$ 2,008.55
1930
149,068.95
147,110.48
122,355.96
1,958.47
1931
159,204.11
157,196.11
117,671.35
2,008.00
1932
157,797.34
156,762.76
137,133.16
1,034.58
1933
174,880.35
173,692.14
132,793.58
1,188.21
1934
227,506.72
147,063.75
117,435.92
80,442.97
1935
343,141.81
178,377.81
145,314.93
164,764.00
1936
1,296,907.49
1,261,538.63
1,002,528.14
35,368.86
1937
1,538,626.22
1,504,768.52
1,172,596.72
33,857.70
1938
1,947,402.78
1,715,805.52
1,222,096.86
231,597.26
1939
2,119,051.11
1,823,543.30
1,376,944.70
295,507.81
1940
2,722,283.06
2,465,414.47
1,872,802.11
256,868.59
1941
5,292,430.92
4,486,927.43
3,354,664.04
805,503.49
*151 Federal
Net
Income
Income
& Profits
Per
Year
Taxes Paid
Books
1929
$ 2,008.55
1930
1,958.47
1931
2,008.00
1932
1,034.58
1933
$ 179.25
1,008.96
1934
163.38
80,279.59
1935
14,831.75
149,932.25
1936
30,139.92
5,228.94
1937
10,976.62
22,881.08
1938
9,764.42
221,832.84
1939
62,869.73
232,638.08
1940
66,644.85
190,223.74
1941
233,591.73
571,911.76
Gross income for 1942 was a little in excess of $10,000,000, and total expenses, exclusive of Federal taxes, were approximately $8,300,000. Statement of petitioner's credit bank balances at the end of each of the years 1929 to 1936, inclusive, and at the end of each month during the years 1937 through 1941: Year
Amount
1929
$ 2,661.96
1930
149,983.07
1931
242,605.20
1932
225,583.22
1933
243,533.07
1934
265,338.80
1935
334,497.07
1936
369,079.91
Month
1937
1938
1939
1940
1941
January
$393,754.40
$484,196.88
$642,513.36
$860,745.45
$1,016,597.62
February
381,523.87
507,998.64
627,330.45
868,424.19
1,126,338.22
March
372,322.60
509,194.23
623,441.78
835,742.24
1,133,436.29
April
413,881.26
504,144.46
688,710.12
842,974.82
1,117,722.20
May
413,877.28
517,219.43
679,383.82
846,301.94
1,260,124.09
June
425,869.76
511,383.97
693,852.85
862,326.12
1,347,312.65
July
416,939.36
469,462.58
717,708.88
884,794.47
1,475,278.66
August
438,314.26
469,101.69
772,532.88
898,739.04
1,613,374.19
September
438,170.06
507,159.73
808,467.07
904,428.03
1,618,031.69
October
449,031.03
523,395.81
809,526.03
920,724.88
1,612,997.04
November
453,916.39
560,512.77
799,027.44
966,261.63
1,752,819.40
December
468,106.56
570,347.68
828,726.95
985,012.85
1,666,336.20
Average
$422,142.23
$511,176.49
$724,251.80
$889,706.31
$1,395,030.69
*152 Petitioner's balance sheets at the end of the years 1934 through 1941 were as follows: ASSETS:
1934
1935
1936
1937
Cash
$268,401.50
$337,559.77
$374,279.91
$473,106.56
Receivables: Clients
9,580.87
21,318.70
12,314.33
15,392.20
Employees (other than Messrs. Gibbs
& Cox)
124.47
1,099.80
Furniture & Fixtures
788.46
944.12
811.10
806.84
Deferred Items
67.00
100.00
200.00
100.00
TOTAL ASSETS
$278,837.83
$360,047.06
$388,705.14
$489,405.60
LIABILITIES:
Accts. Payable
4,073.22
12,782.33
25,639.09
9,572.92
Advances on Contracts
156,466.46
79,034.33
89,581.05
183,536.78
Deferred Items
25.66
5.48
Capital Stock
30,000.00
30,000.00
30,000.00
30,000.00
Earned Surplus
88,298.15
238,230.40
243,459.34
266,290.42
TOTAL LIABILITIES
$278,837.83
$360,047.06
$388,705.14
$489,405.60
ASSETS:
1938
1939
1940
1941
Cash
$575,597.68
$833,976.95
$990,012.85
$1,677,967.41
Receivables: Clients
27,990.37
56,703.75
35,442.39
416,918.27
Employees (other than Messrs. Gibbs
& Cox)
175.00
299.02
Furniture & Fixtures
554.86
554.86
692.44
1,335.53
Deferred Items
100.00
100.00
128.00
119.00
War Savings Stamp Fund
500.00
TOTAL ASSETS
$604,417.91
$891,634.58
$1,026,275.68
$2,096,840.21
LIABILITIES: Accts. Payable
12,259.53
5,807.97
1,680.88
246,939.95
Advances on Contracts
113,825.59
174,827.94
122,431.09
376,061.54
Deferred Items
209.53
237.33
1,178.63
941.88
Income Tax Payable for 1941
264,853.20
Capital Stock
20,000.00
20,000.00
20,000.00
20,000.00
Earned Surplus
458,123.26
690,761.34
880,985.08
1,188,043.64
TOTAL LIABILITIES
$604,417.91
$891,634.58
$1,026,275.68
$2,096,840.21
*153 Petitioner has at all times conserved its resources in the form of cash. It has never invested in securities of any kind. It has never made loans to its stockholders, nor they to it. The Gibbs brothers have each received a salary of $42,000 a year since 1937. They each received $38,000 in 1936, $20,000 in 1935 and smaller amounts before that time. Beginning in 1935 Cox has received a salary of $10,000 a year. In December of 1941 petitioner paid $168,000 in advance on its Federal tax liability for the year 1941; and near the end of 1942 it paid $1,500,000 in advance on the tax liability that would become due for the year 1942. One reason for doing this was that petitioner did not want Federal officers to think that it had these amounts of cash on hand which in effect were earmarked to pay an accruing liability. During the taxable years petitioner did design work for Federal and for other shipbuilding companies that were associated with Federal in the financial arrangements hereinabove described. Bath was one of the shipbuilding companies associated with Federal for whom petitioner did work during each of the tax years and thereafter. During 1937, 1938 and 1939 the only other shipbuilding *154 company with which Federal was associated was United, but petitioner did an insignificant amount of work for the latter company during those three years and none thereafter. Beginning in 1940 companies which became associated with Federal included Seattle-Tacoma Shipbuilding Corp., Todd-Bath Shipbuilding Corp. and Todd-California Shipbuilding Corp. Petitioner had substantial contracts with each of these three companies, its gross income therefrom in 1941 aggregating $1,652,782.38. During the tax years petitioner also performed designing services under contracts with its so-called separate clients - clients which were not connected in any way with Federal or with the financial arrangements between petitioner and Federal hereinabove discussed. The so-called separate clients included United States Lines, Grace Line, Inc., A. H. Bull & Co., the United States Army and Navy and the Maritime Commission. The greater part of petitioner's gross income is derived from Federal, Bath and other associated shipbuilders, as appears from the following figures: Sources of Gross Income
Federal,
Bath
and other
Petitioner's
Total
Associated
Separate
Gross
Year
Shipbuilders
Clients
Income
1936
$1,112,853.51
$184,053.98
$1,296,907.49
1937
1,360,922.67
177,703.55
1,538,626.22
1938
1,651,483.25
295,919.53
1,947,402.78
1939
1,657,965.37
461,085.74
2,119,051.11
1940
2,204,654.90
517,628.16
2,722,283.06
1941
4,407,589.24
884,841.68
5,292,430.92
*155 Petitioner divides its expenses into two categories. The first comprises the direct operating costs at 21 West Street which are directly allocated to particular contracts upon which the work is performed or the expenses incurred. Salaries and wages constitute the principal item of such expenses. The second category embraces the costs incurred at the head office at 1 Broadway, including the compensation of the executives and leading designers and other overhead charges that are not susceptible to direct apportionment among jobs done. The direct operating expenses at 21 West Street are much larger in amount than the non-allocated expense, as is disclosed by the following table: - Direct
Operating
Costs at
Other
Total
Year
21 West St.
Expenses
Expenses
1937
$1,179,872.98
$324,895.54
$1,504,768.52
1938
1,373,530.79
342,274.73
1,715,805.52
1939
1,434,337.40
389,205.90
1,823,543.30
1940
1,992,227.63
473,186.84
2,465,414.47 The figures in the left-hand column above, direct operating costs at 21 West Street, were the amounts covered by the financial arrangement between petitioner and Federal, and were reimbursed to petitioner a few days after their *156 payment by petitioner. By far the greater part of petitioner's direct operating costs at 21 West Street during the taxable years was incurred on work done for Federal and shipbuilding companies associated with Federal, as follows: [1]
Allocated to
Allocated to
Total
Federal and
Petitioner's
Direct
Associated
Separate
Operating
Year
Shipbuilders
Clients
Costs
1937
$1,160,451.96
$19,421.02
$1,179,872.98
1938
1,343,324.20
30,206.59
1,373,530.79
1939
1,368,142.26
66,195.14
1,434,337.40
1940
1,892,394.65
99,832.98
1,992,227.63
The contracts under which petitioner performed services for Federal, associated shipbuilders and its separate clients called for two types of remuneration. The first was to reimburse petitioner for the direct operating costs at 21 West Street. The second was an item of fixed compensation, intended to cover the services of the executives and leading designers and other nonallocable costs and to provide a margin *157 of profit. The fixed compensation was based on the particular job done and not on a percentage of cost. It was dependent upon the number of shisp involved and the value and difficulty of the work. As a general rule the contracts provided for the payment of the fixed compensation in three or four series of monthly installments. In the first series of months the installments were small. They increased in the next series, and in the final series of months they were much larger. The final series of installments are usually received after completion of the ship. Petitioner carries an account on its books and balance sheets, as set forth above, entitled "Advances on Contracts." This account reflects amounts of fixed compensation actually received by petitioner from clients in excess of the amounts which it considers to have been earned under the various contracts at any given time. Expenses at 1 Broadway are charged against this account. When weekly pay rolls, rents and other costs became due in the tax years petitioner paid them. Within a few days thereafter, and pursuant to the financing agreement, Federal would remit to petitioner the amount of the pay rolls, rents and other costs with *158 reference to the operation of the staff at 21 West Street. As appears above, most of the work done by the design staff at 21 West Street was done for Federal and its associated shipbuilders, and only a small part was done for petitioner's separate clients. When petitioner came to prepare and render bills for its services at 21 West Street, the only amounts it actually collected on such bills were the charges against the separate clients. The charges for work done for Federal and associated companies were merely offset against the funds initially supplied to petitioner by Federal. The associated companies would then reimburse Federal for their share of such charges or Federal would charge their share to funds theretofore advanced by such companies to Federal to assist in the financial arrangement. The amounts remitted by Federal in the first place to reimburse petitioner for its operating expenses at 21 West Street were never set up on petitioner's balance sheets. When petitioner's bills were finally rendered, entries were then made on its books to reflect the accounts receivable from its separate clients and corresponding amounts were set up as accounts payable to Federal. As soon *159 as petitioner received payment from. hts separate clients it repaid Federal for such advances in behalf of work done for separate clients. So far as services performed for Federal and its associated companies were concerned, nothing ever appeared on the balance sheets, with respect to sums remitted by Federal. In 1941 the Navy Department took over Federal's shipyards. At petitioner's request the Navy continued to carry out the financial agreement between petitioner and Federal by promptly remitting operating costs to petitioner. When the yards were returned to Federal in January 1942 its officers expressed anxiety over the large amounts being advanced to petitioner. As appears above, petitioner was then doing a large amount of work for new shipbuilding companies that had become associated with Federal. The result of Federal's complaint was that Bath and Seattle-Tacoma each advanced $330,000 to Federal to assist Federal in carrying the financial burden, and later another associated shipbuilder contributed $150,000 to the fund. With reference to rendering bills for direct operating expenses, petitioner's accounting year is divided into eight fourweek periods and four five-week periods. *160 Bills are prepared at the end of each period. Petitioner's pay rolls have always been based on time cards, which are constantly checked by representatives of the Navy Department and the Maritime Commission stationed at petitioner's office. The cards are taken daily to Federal's office at Kearny, New Jersey, and put through machines to record the actual direct labor. The cards are then returned to 21 West Street to form the basis of an audit of the bills which finally emerge. As each accounting period comprises four or five weeks, there are four or five pay rolls before the accounting period terminates; and at that time bills are prepared for the charges in that period, not only for labor, but for rent and other allocable expenses. Petitioner's bills are, in fact, prepared in Federal's office and the preparation of the bills usually requires three weeks' time after the close of an accounting period. The bills are then sent to 21 West Street for audit and checking by Navy Department and Maritime Commission auditors. This audit and the preparation of schedules breaking down each expense usually require a further period of three weeks. After such audit public vouchers are attached to *161 the bills and they are rendered to petitioner's clients. Payment, as a general rule, follows within two weeks. Each bill contains approximately fifty pages of figures. Approximately twelve or thirteen weeks elapse between the beginning of an accounting period and the time that petitioner actually receives payment from its separate clients for services performed during such accounting period. During the tax years the elapsed time was longer, between fifteen and eighteen weeks. Substantial additional surtaxes would have been due from petitioner's stockholders if petitioner had distributed its earnings for and during the years 1938, 1939 and 1940, which the stockholders knew. No dividends have ever been paid by petitioner. During each of the years 1938, 1939 and 1940 the earnings or profits of petitioner were permitted to accumulate beyond the reasonable needs of its business and petitioner was availed of in those years for the purpose of preventing the imposition of surtaxes upon its stockholders. 2. Under the four-party agreement which existed prior to 1936 petitioner was engaged in producing designs for destroyers that were being built by Federal, Bath and United. In accordance *162 with the agreement petitioner received by the end of 1936 fixed compensation in monthly installments aggregating $140,000. The contract provided for the payment of an additional sum of $62,800 as a bonus, depending upon petitioner's skill, ability and performance. The ships for which the designs were made were delivered in the latter part of 1936. At that time the officers of Federal, Bath and United agreed that petitioner's performance had been such as to entitle it to the bonus. Early in 1937 Federal and Bath paid petitioner their respective one-third shares of the bonus, and United, being in financial difficulty, paid its share piecemeal, the greater part during 1937 and the balance in 1938. The sum actually received by petitioner during 1937 on account of the bonus was $56,575.11. A short time after the payment by Federal and Bath, in the latter part of March 1937, a violent storm disclosed a defect in one of the destroyers. The adjustments of the Navy Department with reference to such defect, which was common to fifteen other destroyers, continued for many months, in connection with which petitioner made expenditures during 1937 and also in 1938. The defect was one for which no *163 blame could be placed upon petitioner. During the course of designing, W. F. Gibbs had been convinced that the structure of the vessel, as proposed by the Navy, was not sound. He proceeded to Washington to present his views, warned the shipyards of the situation, and requested their representatives to accompany him to Washington. Notwithstanding these protests the Navy insisted that their proposals were sound, and there was nothing for petitioner to do but proceed in accordance therewith. The facts, however, were carefully recorded, with the result that the Secretary of the Navy, about four months after the accident which ensued and after full investigation, ruled that petitioner was blameless because it had drawn the matter clearly to the Navy's attention. One-half of the amount of the bonus received in 1937 was declared as profit on petitioner's original income tax return for that year, filed on or about March 15, 1938; by an amended return the position was taken that none of it should have been reported in 1937. Until 1938 the amount of $56,575.11 appeared in petitioner's balance sheets as an advance on contracts. The Commissioner determined that the sum of $56,575.11 should be *164 included in petitioner's gross income for 1937. 3. On petitioner's books and records taxes, including excess profits taxes (declared value excess profits taxes for 1940), were deducted only when they were actually paid. In computing net income on its return for each taxable year petitioner deducted the excess profits tax payable for such year; the respondent in the notice of deficiency allowed the deduction of the excess profits tax actually paid during that year. The excess profits taxes were paid as follows: Taxable Year
Amount
Year Paid
1937
$ 21.18
1938
1938
23,291.67
1939
1939
12,960.94
1940
1940
5,188.51
1941
4. Petitioner's return for 1938 reported an income tax of $39,578.06 and an excess profits tax of $23,291.67, a total tax liability of $62,869.73. This liability was discharged by a payment of $46,334.67 on March 13, 1939 and a payment of $16,535.06 on October 30, 1939. On March 11, 1942, petitioner filed claim for refund of $13,116.89 of income and excess profits taxes paid by it for 1938. Opinion ARUNDELL, Judge: Respondent has abandoned his claim that petitioner is subject to section 102 for the year 1937, and our consideration is therefore limited *165 to the three succeeding years. The Gibbs brothers, who own all the stock of petitioner, are naval architects and engineers. They are the spark plugs of the enterprise and the present war has made their business expand by leaps and bounds. Petitioner is essentially a personal service organization. It is paid for services rendered, and in turn its chief expense is the payment of the wages and salaries of those who actually perform the services. Its need for working capital has been very small, compared with its volume of business, due chiefly to advantageous financing by its clients. Notwithstanding the large expansion in its business petitioner appears never to have been out of pocket for operating expenses in excess of $200,000, and this amount for only a few days at a time. The capital and surplus at the beginning of 1938, represented by cash on hand, were ample to cover this amount. The bank balances remained substantially constant from month to month, except as they were increased as a result of the accumulated earnings. From these facts it is plain that the increase in capital and surplus from the beginning of 1938 to the end of 1940, an increase of $604,694.66, was not in fact *166 used in the business. Our first inquiry is whether this large increase in surplus, though never actually employed in the business, was an accumulation required by the reasonable needs of the business. Petitioner's business comprised two classes of services. The first was performed at 1 Broadway, where were located the senior executive officers and leading naval architects who conceived and designed what might be termed the master specifications and plans. This was the type of work commonly performed by the average marine architect. The other branch was conducted at 21 West Street. It was here that the mechanical drafting force was located which worked out the detailed plans for each vessel under the supervision of the 1 Broadway office. The work done at this latter office was of a character which had theretofore usually been performed by the drafting staffs of the shipyards which received the contracts. It was a service undertaken by petitioner at the request of the three shipbuilding companies, Bath, Federal and United, which had never before built naval vessels or else had inadequate design staffs. It was undertaken by petitioner originally in a supervisory capacity, but later, *167 upon the insistence of the shipbuilders, as a part of petitioner's own business. This was done, however, with the plain understanding that petitioner could not finance it, and with the explicit agreement of the shipbuilders to do the financing by paying petitioner's expenses of operation at 21 West Street within a day or two after payment by petitioner. There is no argument, and could be none, that the accumulation of over $600,000 of surplus in the tax years was required to finance the executive office at 1 Broadway. The expenses of that office and other general overhead expenses are charged to fixed fees. The significant factor here is that petitioner receives prepayment of such expenses from its various clients. The extent of the prepayment is reflected in the account "Advances on Contracts," and to the extent of this account cash on hand that has been received as petitioner's own, against which these expenses are charged, is not even included in surplus. Since in all of the years there has been a balance in this account, it is plain that petitioner at all times has had funds available, other than capital and surplus account, to meet its executive expenses at 1 Broadway. The *168 alleged necessity of the accumulation is laid by petitioner to the other phase of the operation at 21 West Street. The argument is that during the tax years petitioner's capital and surplus were never large enough to carry it over the 15 or 18 weeks which elapsed between the beginning of a four-week accounting period and the time payment would have been received in the absence of Federal's advances; and that petitioner could not have operated without its borrowings from Federal. The contention is bottomed on the proposition that section 102 does not require a company to borrow money for its working capital and cannot be construed to prohibit petitioner, at the risk of a severe penalty, from accumulating sufficient funds to carry on the operations at 21 West Street without financial aid from the shipbuilders. The impression is also sought to be created that there was danger of such aid being withdrawn at any time. We think the argument is entirely without merit. As has been said, petitioner agreed to do the work at 21 West Street only at the insistence of the shipbuilders and after it had been made clear to them that petioner could not and would not finance it. The undertaking was *169 begun more or less as a favor to the shipbuilders and upon their promise to pay the expenses involved in a certain manner. With slight alterations this procedure has been followed by the shipbuilders ever since, for seven years. New companies have become associated with Federal in the enterprise and have put up their share of the expenses in the form of a revolving fund with Federal. Having thus undertaken to draw the working plans that are usually drafted by the shipbuilders themselves, with an agreement that the shipbuilders would finance the operation, as they have done ever since, petitioner now comes forward with a contention that it was necessary for it to accumulate a large reserve of cash in order to finance this work by itself if the shipbuilders should go back on their agreement. We must dispose of this argument upon the vague facts presented. It is hard to believe that an undertaking of this magnitude was not reduced to writing, but, at any rate, no contracts of any sort have been offered in evidence. Consequently, we do not know whether petitioner is bound by its contracts with the various clients to complete the working plans in all events, nor do we know what binding *170 effect there is to the financial arrangement between Federal and petitioner. The picture we get is that the shipyards have asked petitioner to do a job for them - a job that ordinarily they would have to do themselves - and have agreed to pay petitioner's costs immediately. If the shipyards should decide they no longer want the job done on such basis, the simple answer appears to us that petitioner would not do the job. Having contracted in effect to sell services for cash payment, we think it is unreasonable to accumulate a vast reserve to carry petitioner in case its vendees should decide they do not want to pay cash. Not only is there a total lack of evidence of any likelihood that the shipbuilders would cease to finance the operations at 21 West Street, but the undeniable fact is that petitioner holds the whip hand. The bulk of petitioner's expenses, comprising wages to employees in comparatively low wage brackets, can cease almost momentarily upon any curtailment of its activities. The shipbuilders, however, are under contract with the Government to build ships. Their interest in the operations at 21 West Street is vital; it is essential that they get the working plans that *171 are drawn there - plans which ordinarily the shipyards themselves would draw. As a matter of fact, the shipbuilders for whom petitioner works do not have design staffs to do what petitioner is doing in their behalf and the yards and the Government are dependent upon petitioner for the services it is performing. We find no factual basis for saying that petitioner was at the mercy of the shipbuilders or that there was danger of the latter withdrawing their financial aid. There is nothing to show that prior to 1942 Federal ever suggested that the plan be discontinued. The Navy was induced without any difficulty to continue the payments after it had taken possession of Federal's yards in 1941; and the complaint which Federal raised at the beginning of 1942 when the yards were returned to it appears to have been an objection not to the plan itself but to a situation that had developed; namely, that Federal was advancing funds for substantial work done for three new associated shipbuilders which had supplied none of the financial assistance. The solution was the one to be normally expected., a fund of $810,000 was supplied by the associated companies to Federal to assist it in the financial *172 arrangement. This episode does not show that Federal desired to discontinue its financing; if anything, it demonstrates that the associated companies were willing to assume their share of the responsibility. We think it is worthy of note that peitioner had cash of $1,677,967.41 at the beginning of 1942, sufficient to carry it approximately three months without the receipt of any further compensation. We cannot help but feel that if there had been any real insistence upon Federal's part that the plan be discontinued or if Federal was within its rights to insist upon such change, the beginning of 1942 was the logical time to break with the past. Moreover, it should be pointed out that under petitioner's theory or policy dividends could never be declared during a period of expansion. This is made clear by the fact that petitioner has not yet paid a dividend, though its accumulated cash now exceeds $2,000,000. Consequently, we have here a fund of over $600,000 accumulated in the three tax years, upon a pre-existing surplus of nearly $300,000 which alone was ample working capital for petitioner according to the manner in which its business was conducted, which accumulation was not used *173 in the business and, if petitioner has its way, will never be used in the business. It is in the nature of a reserve to meet a contingency - a contingency which, in our opinion, based upon established facts, will in all likelihood never occur, a contingency which it is within petitioner's power to prevent. As the Supreme Court pointed out in Helvering v. National Grocery Co., 304 U.S. 282, the corporate business could have been as well protected against unexpected demands for capital if these funds had been distributed to and held by the two stockholders. Since the reason principally relied upon by petitioner fails as a convincing ground for the accumulation, the conclusion is inescapable that the earnings in these three years were permitted to accumulate beyond the reasonable needs of the business. A number of subsidiary reasons allegedly justifying the accumulation are also listed, but the simple truth is that petitioner does not have the factual background to support them or the desired conclusion. Its suggestion of a reserve to meet possible damage suits finds no support in this record. It, in fact, set up no reserve for such a contingency; it did *174 not produce the contracts from which we could draw what was the extent, if any, of its liability; and the record discloses no such claim for damages at any time during petitioner's life. Nor are we impressed with the testimony of the two experts called by petitioner. They were consulted by petitioner, not for the purpose of securing genuine business advice to guide its financing, but to obtain corroborating evidence after it had been suggested by the Government that its failure to distribute would likely charge it with tax under section 102. Their opinions were based upon working capital needs in the absence of the arrangement with Federal. Since we have rejected this premise as unsound, the opinions likewise fall. We are left with the question whether the accumulation was for the purpose of preventing the imposition of surtaxes upon petitioner's shareholders. Without creating a conclusive presumption, the statute goes far in saying that the conclusion we have just reached on the first question shall be determinative of the second. It provides that an unreasonable accumulation "shall be determinative of the purpose to avoid surtax upon shareholders unless the corporation by the *175 clear preponderance of the evidence shall prove to the contrary." Section 102(c), Revenue Act of 1938, and Internal Revenue Code. Aside from the categorical denials of the stockholders there is little evidence to rebut this strong statutory presumption. Such denials, of course, are necessarily present in all cases under section 102 and, while entitled to such weight as they merit, are not controlling. Helvering v. National Grocery Co., supra;Helvering v. Chicago Stock Yards Co., 318 U.S. 693. The fact that distributions were not made in 1937, when an undistributed profits tax was incurred by the failure to do so, is legally neutral, for the proof shows that such undistributed profits tax was approximately the same amount as the additional surtaxes of the shareholders would have been if the distributions had been made. While the making of loans to the principal stockholder belies a need for increased working capital, the absence of such loans hardly points to a lack of the forbidden purpose. This would seem particularly true when the regulations of the Commissioner have issued a warning that such loans would be deemed indicative *176 of the forbidden purpose: See Regulations 103, section 19.102-2. We have found that petitioner's officers and stockholders permitted its surplus to accumulate beyond the reasonable needs of the business, for an alleged purpose which we have concluded was without substance. With that determination in mind, the question is whether they made the accumulation solely out of an over-abundance of caution, or whether a savings in surtax played a part. Here it is made to appear that by refraining from distributing any of the earnings the shareholders have avoided substantial surtaxes. That was the effect of their action, and an ordinary presumption is that the effect is among the purposes of the actor. R. L. Blaffer & Co., 37 B.T.A. 851, 856, affd. 103 Fed. (2d) 487, certiorari denied 308 U.S. 635. The stockholders knew that distribution would have increased their surtaxes. As petitioner's counsel state, "Obviously they were not morons." As between such knowledge on one hand and a patently weak reason on the other hand for accumulating a large reserve of cash, we are firmly convinced that the surtaxes to *177 be saved played a part, and a very important part, in the determination to refrain from making distributions. See Trico Products Corp. v. Commissioner, 137 Fed. (2d) 424, affirming 46 B.T.A. 346. Consequently, we find the existence of the prescribed purpose. Respondent's determination with respect to the years 1938, 1939 and 1940 is accordingly sustained. On the second issue petitioner invokes the familiar rule "that where a taxpayer receives a sum of money to which he is not then entitled as his own, and which does not become his own until a later year, he does not receive income until the later year." E. P. Madigan, 43 B.T.A. 549, Warren Service Corp v. Commissioner, 110 Fed. (2d) 723. Petitioner contends that it has consistently reported income only when and as earned; that the bonus for good performance was paid prior to the time the trials, which would determine good performance or the lack of it, had been completed; that petitioner accordingly could not have become entitled to the bonus until 1938; and that until that time it treated the bonus as an advance, *178 thereby acknowledging that it held the amount in trust for Federal, Bath and United. In our view, however, this issue must be decided against petitioner upon the principle that income received under a claim of right and without restriction as to its use must be reported even though there is a possibility that the income or part of it may be claimed by others or eventually repaid. North American Oil Consolidated v. Burnet, 286 U.S. 417; Brown v. Helvering, 291 U.S. 193. The shipbuilders agreed in 1936 that petitioner had earned the bonus and there is no indication whatever that they subsequently thought otherwise; as a matter of fact, United continued to pay its share of the bonus in installments during 1937, and since the accident occurred early in that year, it is presumed that some of the payments by United were made with knowledge of the accident. There is no evidence that the shipbuilders ever suggested that the money be returned or held in abeyance or that it was not paid to petitioner as its own and subject to its unfettered dominion. Petitioner never admitted or contended that it was not entitled to it. The fact *179 that it may have been treated as an advance on the books is not controlling, nor is it particularly helpful to petitioner here. That petitioner was none too certain it held the amount as in trust or as an advance is illustrated by the fact that it declared one-half of the sum as profit on its original return for 1937, and only at a later date did it file an amended return and take the position that no part of the bonus was income until 1938. Furthermore, if the decision were controlled by petitioner's method of accounting it would nevertheless be adverse to petitioner. The contract is not before us, but we should suppose that the bonus was given as compensation for the good performance of petitioner's design work. Those services were completed in or prior to 1937, and it was recognized by the promisors that they had been well performed. The accident occurred early in 1937, but it was thereafter determined that petitioner was not at fault and that conclusion was reached by the naval authorities before the end of 1937. The services performed by petitioner in 1937, which also ran into 1938, were to assist in remedying a defect for which petitioner was not responsible. There is no basis *180 for saying that the performance of such services was a prerequisite to the right to the bonus. But even if it were, the bulk of them was apparently performed in 1937, and upon the present record we would be compelled to hold that the bonus had been earned to the extent payment was received in 1937. We therefore affirm respondent's determination. The remaining issue concerns the proper time for deducting the excess profits tax (the declared value excess profits tax for 1940) in computing net income for normal tax purposes. Petitioner would deduct in each year the tax that became payable for that year rather than the tax that was actually paid therein. The Commissioner allowed the deduction of the tax actually paid. The determination of the Commissioner was proper if petitioner was on the cash basis or if his action was in accordance with the method employed by petitioner in keeping its books and records and if such method correctly reflected income. Internal Revenue Code, sections 41 and 43; I.T. 3068, C.B. 1937-1, p. 70; Mim. 4676, C.B. 1937-2, p. 97. It is clear that petitioner was not on an accrual basis and although petitioner alleges that it was on a percentage of completion *181 basis, the latter basis is not inconsistent with a cash basis. Petitioner had no accounts for work in progress, accrued wages or supplies on hand. Its return for 1937 purports to have been filed on the cash basis, and there is no evidence of any change having been approved by the Commissioner. There was no liability set up on petitioner's books for accrued taxes; on the contrary, taxes were charged against book income only when paid. Consequently, the Commissioner's determination has adopted the method used on the taxpayer's books. There is nothing to suggest that this distorted income. Upon a record of this kind there is insufficient evidence for use to conclude that the Commissioner's determination was erroneous. It is therefore approved. Decision will be entered under Rule 50. Footnotes
1. Operating costs attributable to separate clients amounted to $764,590.60 in 1941 and $3,338,000 in 1942. Operating costs attributable to Federal alone amounted to $2,058,807.66 in 1941 and $2,852,000 in 1942.↩