HELVERING, COMMISSIONER OF INTERNAL REVENUE, *v.* CHICAGO STOCK YARDS CO.

No. 488. Argued March 9, 10, 1943.—Decided April 12, 1943.

*Assistant Attorney General Samuel O. Clark, Jr.,* with whom *Solicitor General Fahy* and *Messrs. Sewall Key, Arnold Raum, Alvin J. Rockwell,* and *Carlton Fox* were on the brief, for petitioner.

*Mr. George Wharton Pepper,* with whom *Messrs. L. E. Green, Frederick H. Spotts,* and *Erwin N. Griswold* were on the brief, for respondent.

MR. JUSTICE ROBERTS delivered the opinion of the Court.

The Board of Tax Appeals sustained the petitioner's determination of deficiencies in the respondent's income tax for 1930, 1932, and 1933.[1] The Circuit Court of Appeals reversed the Board's decision.[2] We granted certio-

[1] 41 B. T. A. 590.
[2] 129 F. 2d 937.

rari because of the importance of the questions involved.

The challenged assessment was of the fifty per cent additional tax imposed by § 104 of the Revenue Acts of 1928 and 1932.[3]  The section, which is substantially the same in both statutes, provides, in subsection (a), that if any corporation is formed or availed of for the purpose of preventing the imposition of surtax upon its shareholders through the medium of permitting its gains and profits to accumulate instead of being divided or distributed, the additional tax shall be imposed.  That the corporation "is a mere holding or investment company," or that the gains or profits are "permitted to accumulate beyond the reasonable needs of the business," is declared, by subsection (b), prima facie evidence of a purpose to avoid the surtax.

The Union Stock Yards & Transit Company of Chicago, hereinafter called Transit Company, was incorporated in 1865 to operate stock yards in Chicago.  Its business was profitable.  Frederick H. Prince became a stockholder.  In 1890, packers, who were the company's principal source of business, threatened to remove their plants from Chicago unless they were given a share in its profits.  Due to limitations in its charter, the corporation could not raise funds necessary to buy off the packers.  Mr. Prince and other stockholders met the situation by organizing a holding company under the law of New Jersey, the Chicago Junction Railways & Union Stock Yards Company, hereinafter called the New Jersey Company, which acquired all of the capital stock of the Transit Company.  The capital structure at organization was 65,000 shares each of preferred and common, all of $100 par.  Collateral trust bonds, secured by Transit Company stock, were issued, of which $14,000,000 were ultimately out-

---

[3] 45 Stat. 814–15, 47 Stat. 195.

standing. The charter was to expire in 1940. The New Jersey Company came to own all of the stock of the Transit Company, of a railway company, a railroad company, and all beneficial interest in a real estate trust, which themselves, or through subsidiaries, pursued activities collateral to the stock-yards business. By payments in cash and its own bonds, it procured from the packers an agreement to maintain the stock yards at their then location for fifteen years.

When this agreement was about to expire, the packers presented fresh demands and Mr. Prince was compelled to devise some method of satisfying them. He decided that, if he could obtain the coöperation of the largest, he need not trouble about the others. To attain this end, he organized, in 1911, the respondent, a Maine corporation. He formed a committee which made a proposal to the New Jersey Company's common stockholders that the respondent would purchase their stock by giving them $200 par of its 5% bonds for each share of common stock, or, in the alternative, would stamp the stock with the company's agreement to guarantee a 9% dividend upon it; this in consideration that the respondent should be entitled to all of the New Jersey Company's earnings over and above its expenses, interest charges, and the guaranteed dividend on the common. Thus it was intended to draw into the taxpayer's treasury the excess of the New Jersey Company's earnings. Armour & Co. was given 20% of the respondent's stock, Prince retaining 80% of it. In this way, Armour was to share in the earnings of the stock yards.

By a decree in a suit under the Sherman Act, Armour was ordered to part with all interest in the stock yards. In consequence, Mr. Prince purchased the Armour-held stock for $1,000,000, which sum was loaned to him by the respondent. Thus, Prince became the taxpayer's only stockholder; and it is conceded that he retained owner-

ship or voting power which gave him sole control of the company to the close of 1933.[4]

By August 1914 the respondent had acquired, in exchange for its bonds, 31,075 common shares of the New Jersey Company, and 33,922 shares had been stamped with its guarantee. In 1919 it acquired the three remaining shares. In the period from 1915 to 1933, it organized two small wholly-owned subsidiaries to transact business connected with the stock-yards enterprise; and also organized, and held four-fifths of the capital stock of, a national bank intended to serve the stock-yard district.

The respondent in addition to the New Jersey Company common stock acquired by exchange of its own bonds therefor, bought such stock for cash. By December 31, 1929, it had acquired 58,742 of the 65,000 shares outstanding.

As the charter of the New Jersey Company was to expire in 1940, Mr. Prince, at some date not clearly fixed by the testimony, formed the plan of accumulating cash in the respondent's treasury sufficient to pay the debts of the New Jersey Company and liquidate it by that time. To do this, it would be necessary to redeem the outstanding preferred stock at par, pay off the $14,000,000 mortgage and over $6,000,000 of fixed obligations of subsidiaries which had been guaranteed by the New Jersey Company. It would also be necessary to purchase 6,258 shares of New Jersey common not then owned. Thus, as of December 31, 1929, the plan involved the expenditure of about $28,000,000 by 1940. If it could be consummated, the taxpayer would then own the entire stock-yards enterprise clear of debt, other than its own bonds then outstanding in the amount of $3,227,000 due in 1961. That enterprise, treated as a whole, then had cash and liquid

---

[4] He placed some of the stock in trust, retaining voting control.

assets amounting to $21,705,185,[5] and fixed and other assets of a book value of $40,000,000. The bulk of the liquid assets had been drawn up into the respondent's treasury by virtue of the agreement with the New Jersey Company's stockholders.

The respondent's assets December 31, 1929, exceeded its liabilities, including its capital stock, by $19,622,355. From that date to the close of 1933 its earnings were $10,243,373, of which $1,600,000 was paid out in dividends, and $8,643,373 was added to earned surplus.[6]

These are the salient facts. They are stated in greater detail by the Board and by the court below.

The Board reached these conclusions: That the respondent was a mere holding or investment company as defined by § 104, and had not overcome the consequent presumption that its surplus had been accumulated for the purpose of avoiding surtax upon the earnings of Mr. Prince, as sole stockholder; that, although it was more than a mere holding or investment company, its profits had been permitted to accumulate beyond the reasonable needs of the business, and the evidence did not overcome the prima facies which § 104 (b) attributes to this fact; and that, without the benefit of the presumptions created by § 104 (b), the proofs require the conclusion that the respondent had been availed of for the purpose of accumu-

---

[5] Including some $2,000,000 of impounded charges not released to Transit Company until 1932 and a working fund claimed by respondent to require $5,000,000.

[6] This item included additional cash on hand of $2,755,931 ($1,800,-000 of which was a subordinated deposit in a stock-yards bank), loans to subsidiaries and to Mr. Prince, purchases of common and preferred stock of the New Jersey Company and of respondent's own bonds, and other investments, and an investment of $3,573,218 in securities of stock-yards banks which needed financial support. Similar subordinations of deposits and bank investments were made by subsidiaries.

lating profits beyond its needs for the purpose of avoiding surtax upon its stockholder.

The Circuit Court of Appeals held that, viewing the facts most favorably to the Government, the respondent was not a mere holding or investment company within the meaning of the statute; that, in concluding the company had accumulated profits beyond its reasonable needs, the Board had employed a wrong yardstick in that it had failed to give weight to the controlling purpose of the accumulation, namely, the long range plan to liquidate the New Jersey Company and consolidate all the assets, free of debt, in the respondent; and, finally, that, in purporting to reach its final conclusion without reference to the statutory presumptions, it had allowed them to affect its judgment. Accordingly the court reversed and directed the Board to retry the case in conformity to the court's opinion.

The petitioner urges acceptance of the Board's first conclusion that the respondent was a mere holding or investment company. He says that the taxpayer was nothing but a pocketbook for Mr. Prince, who, as an individual, managed and controlled the entire enterprise and used the taxpayer merely as a repository of surplus earnings which were intended ultimately to be used for his benefit. We find it unnecessary to consider this contention, since we think the Board's decision may be supported apart from any presumption arising under the terms of the Act.

The respondent was not formed for the purpose of avoiding surtax on its stockholders. No such exaction existed in 1911. Until some effort was made by legislation to reach and tax accumulated and undistributed surplus, the taxpayer's dividend policy was immaterial. Accumulation of profits in its treasury was of no tax significance and, so far as appears, it was otherwise a matter of indifference, legally speaking, whether surplus moneys were allowed to remain in the treasury or were paid in dividends.

The series of acts which sought to discourage such accumulations had its origin in 1913 with the imposition of an additional tax on the shareholder rather than on the corporation.[7] The additional tax was laid on the corporation by the Revenue Act of 1921 and this method was retained in subsequent acts to and including that of 1932.[8] As the theory of the revenue acts has been to tax corporate profits to the corporation, and their receipt only when distributed to the stockholders, the purpose of the legislation is to compel the company to distribute any profits not needed for the conduct of its business so that, when so distributed, individual stockholders will become liable not only for normal but for surtax on the dividends received.

A corporate practice adopted for mere convenience or other reasons, and without tax significance when adopted, may have been continued with the additional motive of avoiding surtax on the stockholders. The Board's conclusion may justifiably have been reached in the view that, whatever the motive when the practice of accumulation was adopted, the purpose of avoiding surtax induced, or aided in inducing, the continuance of the practice.

The Board, the court below, and the parties in brief and argument have discussed many facts thought to be relevant to the purpose of the accumulation of surplus by the respondent. The interrelation of the taxpayer and the other corporations involved in the enterprise, the expiration of the New Jersey Company's charter, the policy or obligation of the taxpayer to provide for the payment

---

[7] Act of Oct. 3, 1913, ch. 16, 38 Stat. 114, 166–167; Revenue Act of 1918, ch. 18, 40 Stat. 1057, 1072.

[8] Revenue Act of 1921, ch. 136, 42 Stat. 227, 247–248; Revenue Act of 1924, ch. 234, 43 Stat. 253, 277; Revenue Act of 1928, ch. 852, 45 Stat. 791, 814–15; Revenue Act of 1932, ch. 209, 47 Stat. 169, 195. In later revenue acts, a different method of accomplishing the purpose has been adopted.

of the debts of the New Jersey Company and its subsidiaries, the relation of Mr. Prince as officer and active manager of underlying corporations, the financial transactions between him and the respondent, are discussed and arguments pro and con are based thereon in an effort to prove or to disprove the character of the respondent, the necessities of its business, and the nature of the relationship between it and Mr. Prince.

If we eliminate these matters from consideration and treat the respondent as a controller, manager, and, to a large extent, the proprietor of the entire enterprise, we think the Board's conclusion of fact has support in the evidence and must be accepted.

The respondent launched its corporate activities with partners and co-investors in the stock-yards enterprise. The New Jersey Company, which then embraced the entire business, had a capital investment represented by stock and bonds of not less than $27,000,000. In 1911, when the respondent was organized, the enterprise had a net worth of at least $16,000,000.[9]   The respondent, with a paid-in cash capital of $1,000,000, purchased [10] the right to receive the net earnings of the enterprise after the payment of the New Jersey Company's fixed charges, operating expenses, and the guaranteed dividends on its stock. The respondent's goal was the acquisition, by the year 1940, of the interest of all others having any capital share in the enterprise, and the method pursued was to accumulate current earnings [11] so that, by 1940, they would be

---

[9] The net worth was probably some $3,000,000 in excess of the amount named if the actual net worth of subsidiaries is taken into account.

[10] When the plan and agreement with respect to New Jersey Company's common stock was in shape to be consummated, the respondent purchased the plan and the rights arising under it for $1,000,000 (its cash capital), and $7,000,000 par value of its own stock arising out of an increase of its authorized stock from $1,000,000 to $8,000,000.

[11] The respondent has paid substantial annual dividends, the highest being at the rate of $400,000 per year during the taxable years in ques-

available for such capital investment. This investment would, of course, redound to the benefit of the holder or holders of the respondent's stock. The situation disclosed is, in legal effect, similar to that presented in *Helvering* v. *National Grocery Co.*, 304 U. S. 282. There the surplus earnings were invested in securities unrelated to the business in hand and were, and would remain, available for whatever purposes Kohl, the sole stockholder, determined. Here the accumulated earnings became available to the investment purpose and program of Mr. Prince, the sole stockholder of the taxpayer, or for other purposes as he might determine. By the use of the taxpayer's corporate personality, Mr. Prince could plow the earnings of the enterprise into a capital investment which would convert, by 1940, an original capital venture of $1,000,000 into free assets of a value in excess of $60,000,-000. And this without the payment of taxes[12] or surtaxes on the bulk of the earnings. Although Mr. Prince denied any purpose to avoid surtaxes, the Board, as in the *National Grocery* case, was free to conclude, upon all the evidence, that such was the purpose.

The respondent's position is that, as the New Jersey Company's charter was to expire in 1940, and as respondent was under what it deemed a moral and, indeed, a legal obligation to pay off the mortgage debts of the New Jersey Company and its subsidiaries and to redeem its outstanding stock, the accumulation of earnings was necessary to the preservation of its business. There are two sufficient answers. Mr. Prince, the sole stockholder, if in receipt of the respondent's earnings, could equally well have done

---

tion; and Mr. Prince has also received substantial salaries from the respondent and other corporations which were conducting activities of the enterprise.

[12] Most of respondent's income consisted of dividends received from domestic corporations, which were deductible from its gross income for tax purposes.

what the respondent proposed to do, that is, turn accumulated earnings into invested capital. And the evidence shows that the New Jersey Company's charter could have been renewed in 1940. Continuance or refinancing of such an enterprise on the face of things would have been practicable.

We cannot say that the Board's conclusion that respondent was availed of for the purpose of preventing the imposition of surtax upon its stockholders, through the medium of accumulation of its profits, is without substantial support.

The judgment is

*Reversed.*