Hansen Baking Co., Inc., a corporation v. Commissioner.
Hansen Baking Co. v. Commissioner
Docket No. 35612.
United States Tax Court
1953 Tax Ct. Memo LEXIS 208; 12 T.C.M. (CCH) 685; T.C.M. (RIA) 53214; June 18, 1953
*208 Held, that the petitioner did not accumulate its earnings or profits beyond the reasonable needs of its business and accordingly is not subject to the surtax imposed by Sec. 102, Internal Revenue Code. Kenneth A. Cox, Esq., for the petitioner. John D. Picco, Esq., for the respondent. TIETJENS
Memorandum Findings of Fact and Opinion TIETJENS, Judge: The Commissioner determined the following deficiencies in income tax and section 102 surtax against the petitioner: Deficiency
Year
Income Tax § 102 Surtax
Total
1946
$ 295.48
$ 7,773.63
$ 8,069.11
1947
572.89
5,307.19
5,880.08
1948
(527.32)
5,688.85
5,161.53
Totals
$ 341.05
$18,769.67
$19,110.72
Several issues have been abandoned or settled by stipulation. The single issue remaining for decision *209 is whether the petitioner was availed of for the purpose of preventing the imposition of the surtax on its shareholders through the medium of permitting earnings or profits to accumulate instead of being distributed. Findings of Fact The stipulated facts are so found and the stipulation included herein by reference. The petitioner, Hansen Baking Co., Inc. (hereafter called the taxpayer) is a Washington corporation with its principal office in Seattle, Washington. Its books were kept on the accrual basis and its tax returns for the taxable years 1946, 1947, and 1948 were filed with the collector of internal revenue at Tacoma, Washington. The taxpayer is engaged in the business of baking and merchandising bread and related products in Seattle and vicinity. The business was begun in 1911 as a sole proprietorship by Jens L. Hansen with whom his brother Carl and his father later became associated as partners. In 1923 the partnership was succeeded by a corporation and in 1933 two corporations were formed to take over the business. To one, the taxpayer, was transferred the operating business and assets. The second, Hansen Holding Corporation, (hereafter called the Holding Co.) succeeded *210 to the real estate and large items of machinery and equipment of the old concern. The Holding Co. leases the building and heavy equipment to the taxpayer. During the taxable years the rentals amounted to approximately $16,000 per year. Since 1933 the Holding Co. has made all major investments in real estate and heavy equipment. The taxpayer has an authorized capital of $25,000, divided into 1,000 shares of common stock with a par value of $25 per share. As of January 1, 1946, Jens L. Hansen owned approximately 71.9 per cent of the outstanding stock and Carl Hansen owned approximately 25.9 per cent. On December 31, 1948, Jens owned 51.7 per cent of the stock and Carl owned 25.9 per cent. The reduction in Jens' holdings was due to gifts by him of 50 shares to each of his four daughters. Jens and Carl have been equally active in the management of the business, with the former serving as president of the corporations at all times. The Holding Co. is capitalized for $15,000. At all times material herein, Jens owned approximately 70.5 per cent of the outstanding stock and Carl owned approximately 25.3 per cent. Jens and Carl are directors of the Holding Co. and are its president and *211 vice-president, respectively. In 1924, the sales of the taxpayer's predecessor totaled $152,573.89. In 1941, the taxpayer had sales of $372,564.87. However, from that time on the taxpayer's business began to expand rapidly and in 1948 its total sales reached $1,487,070.68. It is now the largest supplier of bakery products in the Seattle area, ranking behind the Continental Baking Company (Wonder Bread), a national concern. The taxpayer competes with local bakery concerns, with national organizations such as Continental Baking Company and Safeway Stores, and with regional chains such as Langendorf's United Bakeries, Van deKamp's, and Mannings. There are approximately 100 bakers supplying bread to the public in the Seattle area. In addition, the taxpayer's business is affected, especially during a period of rising prices such as 1947, by the fact that many prepared bakery mixes are now available so that the individual housewife is able to bake her own bread, cakes, rolls, etc., if she feels that the prices of the taxpayer and the other bakeries are too high. A tabulation showing the taxpayer's sales, profit and loss before taxes, net fixed asets, and officers' salaries for the years *212 1941 to 1948, inclusive, is as follows: Profit or Loss
Fixed
Officers
Year
Before Taxes
Sales Volume
Assets Net
Salaries
1941
$17,142.84
$ 372,564.87
$27,709.99
$19,500.00
1942
20,497.36
570,147.75
20,629.93
19,500.00
1943
32,965.22
743,888.39
22,367.68
19,500.00
1944
15,813.33
756,286.63
19,503.66
19,500.00
1945
15,491.82
885,421.85
42,898.43
19,500.00
1946
68,912.27
1,060,919.81
56,728.26
21,120.00
1947
22,780.80
1,206.392.93
68,044.27
29,120.00
1948
74,680.97
1,487,070.68
68,487.99
29,120.00
A tabulation showing the taxpayer's working capital (current assets less current liabilities) for the years 1941 to 1948, inclusive, is as follows: % of
Working
Working
Capital *
Year
Capital *
to Sales
1941
$54,709.75
14.7
1942
44,887.18
07.8
1943
35,093.77
04.7
1944
41,048.22
05.4
1945
24,479.21
02.8
1946
39,200.05
03.7
1947
48,919.62
04.1
1948
66,146.79
04.4
*213 From 1924 on the taxpayer and its predecessor business had maintained on its books an open account with Jens in which debits were made for withdrawals, and credits for salary and dividends. From 1929 to 1940 this account showed a credit balance ranging from $1,240.69 to $7,504.92. In the taxable years the account showed a debit balance of $8,721.86 for 1946, $5,466.87 for 1947, and $12,972.59 for 1948. It was reduced to $797.45 by August 13, 1949. At all material times Jens was in excellent financial condition and was ready and able to pay the balance owing by him to the taxpayer. Beginning in 1939 the taxpayer realized steady and generally growing profits, never earning less than $13,000. The years 1946 and 1948 were the most profitable in taxpayer's history, with earnings before taxes of $68,912.27 and $74,680.97, respectively. In the transitional year of 1947, earnings fell sharply but still amounted to $22,780.80. This record of profits resulted principally from a sustained growth in volume of sales. The following is a table showing the taxpayer's earned surplus: Year
Amount
1941
$ 9,522.11
1942
12,907.11
1943
15,125.28
1944
20,253.68
1945
30,494.78
1946
59,970.24
1947
77,495.84
1948
97,603.92
*214 An analysis of the taxpayer's investment account shows the following: 1945
1946
1947
1948
Equitable Sav. & Loan
$ 9,750.00
$17,825.49
$17,825.49
Equitable Sav. & Loan
1,875.00
10,812.44
$13,438.87
U.S. Treas. Bonds
3,027.26
3,027.26
3,027.26
U.S. Treas. Bonds
2,838.25
2,838.25
U.S. Treas. Bonds
2,280.00
2,280.00
2,280.00
2,280.00
U.S. Treas. Bonds
2,280.00
2,280.00
2,280.00
2,280.00
Associated Grocers
25.00
25.00
25.00
American Underwriters
30.00
30.00
30.00
30.00
Aurora lot
1,736.30
1,736.30
1,736.30
1,736.30
Quality Bakers of Am.
1,500.00
1,500.00
1,500.00
Best Lock Co.
335.00
335.00
335.00
335.00
Associated Dry Goods Co.
20,171.80
W. F. Hall Printing Co.
2,532.50
Totals
$22,301.81
$33,752.30
$39,851.49
$44,304.47
A tabulation prepared by the Commissioner shows the taxpayer's current assets divided by current liabilities for the years 1946, 1947, and 1948 to be 1.88, 2.17, and 2.37, respectively. The taxpayer and its predecessor paid the following dividends from 1924 to 1948, inclusive: Dividend
Year
Per Share
Total Amount
1924-1937
None
1937
$ 4.50
$ 4,423.50
(declared and re-
turned to surplus)
1938-1940
None
1941
10.00
9,930.00
1942
12.50
12,375.00
1943
11.00
10,923.00
1944
7.50
7,447.50
1945
None
1946
15.00
15,000.00
1947
None
1948
25.00
25,000.00
*215 The year 1946 marked the termination of price and wage controls, including those applicable to the bakery industry. There was uncertainty as to economic conditions incident to the post war period and the year 1947 was one of transition. The taxpayer's directors were apprehensive for their own business and felt impelled to maintain a relatively high liquid position. While labor relations in the baking industry in Seattle were such that no strikes developed during the years in question, there were strike threats and increasing delays were experienced in negotiating labor agreements each year. Short strikes did occur in 1950 and 1951 and a seven weeks' stoppage took place in 1952. During the war years and the taxable years the taxpayer was handicapped by lack of garage and storage space. Plans were under consideration for enlarging the plant in order to cure this deficiency. Contractors were consulted in this respect during 1947. The problem of financing was studied by the directors of the taxpayer, who were also officers of the Holding Co. It was decided that the building project be undertaken by the Holding Co. with funds made available by the taxpayer. The Holding Co's major source *216 of income was the rentals received from the taxpayer and it was much easier for the taxpayer to accumulate the necessary cash than for the Holding Co. The addition to the building was begun in 1950 after bids were taken in 1949. It cost $90,638.61, of which $81,369.91 was borrowed from the taxpayer. If the section 102 net income of the taxpayer had been distributed in the taxable years, Jens and Carl, the two principal stockholders, and their wives would have had to pay the following additional surtax: 1946
1947
1948
Jens L. Hansen
$3,729.47
$1,753.78
$2,234.39
Mary Hansen
(wife)
3,729.47
1,753.78
2,234.39
Carl L. Hansen
959.93
598.39
Lura Hansen
(wife)
959.93
598.39
1,526.99
Totals
$9,378.80
$4,704.34
$5,995.77
The taxpayer was not availed of for the purpose of preventing the imposition of surtax upon its shareholders through the medium of permitting earnings or profits to accumulate instead of being divided or distributed. The taxpayer's earnings and profits were not permitted to accumulate beyond the reasonable needs of its business during the years subject to review. Opinion Opinions in cases involving the application of section *217 102 and its predecessor provisions have often been buttressed with statements to the effect that the surtax thereby imposed is highly penal and that the section should be strictly construed. United Business Corporation of America, 19 B.T.A. 809, affd. (C.A. 2) 62 Fed. (2d) 754; Dill Manufacturing Co., 39 B.T.A. 1023. Whether the surtax is to be applied or not depends primarily on the answer to the question of whether the taxpayer was availed of for the "purpose" of preventing the imposition of the surtax on shareholders and in this respect the important factor is the "intended" corporate use of the retained earnings. In this, as in every case of like character, earnings have been retained rather than distributed to shareholders. But that fact is, of course, not determinative of the proscribed purpose. The focal point of the controversy is whether a greater surplus had been accumulated than was necessary for the reasonable needs of the business. Crawford County Printing & Publishing Co., 17 T.C. 1404. At the risk of misinterpretation, the Commissioner's argument impresses us as being tantamount to saying that the taxpayer cannot *218 accumulate earnings in excess of the actual current needs of its own business without subjecting itself to the penalty of section 102. In other words, even though it was reasonably necessary for the taxpayer to have additional garage and storage facilities in the near future, it could not accumulate funds for that purpose because the needed additions would be actually owned by the Holding Co., rather than the taxpayer, and funds for constructing the additions should have been furnished by the stockholders of the Holding Co. rather than loaned by the taxpayer. For this proposition Helvering v. National Grocery Co., 304 U.S. 282, and Helvering v. Chicago Stockyards Co., 318 U.S. 693, are cited. We think those cases are distinguishable on their facts. We have before us a business established in 1924 which had no substantial growth until 1941. From that year through 1948, the last taxable year involved, its sales expanded from approximately $370,000 to $1,480,000. In the meantime its earned surplus grew from $9,500 to $97,600. For the years in question the growth of the surplus averaged about $22,000 per year and the percentage of working capital to sales was *219 around.04. During the same years the taxpayer's current assets divided by current liabilities, on the basis of the Commissioner's computation, averaged 2.1. With earnings before taxes of $68,912.27 in 1946, $15,000 in dividends were paid and dividends of $25,000 were paid in 1948 on earnings before taxes of $74,680.97. In the interim year of 1947 when earnings before taxes fell to $22,780.80 no dividends were paid. When considered in the light of the fact that these years came hard on the heels of the war when economic conditions were anything but certain we are unable to find the accumulation of earnings was unreasonable or that there was a purpose of avoiding surtax on the shareholders. This is especially true when we consider that plans for plant expansion were under active consideration and a loan of over $81,000 for that purpose was made to the closely related Holding Co. in 1949 or 1950. The Commissioner stresses that withdrawals of some $8,700 in 1946, $5,400 in 1947 and $13,000 in 1948 were made by the principal stockholder of the taxpayer for his own use, and argues that such withdrawals are strong evidence that such funds were not reasonably needed in the business. Under *220 a different set of facts this might well be persuasive. Cf. William C. De Mille Productions, Inc., 30 B.T.A. 826. But here the principal stockholder was at all times ready and willing to repay the advances at any time they were needed for the construction of the additional facilities and, as a matter of hindsight, did do so. We do not think the taxpayer was required, in order to escape the penalty of 102, to insulate such funds held for reasonably anticipated use from advance to its stockholder. The same goes for the investments in Government bonds (which were made in years prior to those here in question and retained during those years) and the investments in unrelated stocks, which were not of major proportions. The retention of these funds by the taxpayer was not unreasonable, and the uses to which they were put in the interim do not necessarily stamp the accumulation as having been for the proscribed purpose. Emphasis is also placed by the Commissioner on the fact that the additions to the plant were not made by the taxpayer, but by the Holding Co. and that the Holding Co. could have financed the project by some other means than a loan from the taxpayer. We suppose *221 the Holding Co. Might have done so. But the Holding Co. was closely related to the taxpayer both in its ownership and the fact that its properties were leased by the taxpayer for direct use in the taxpayer's business. In somewhat comparable circumstances we have held that the taxpayer is not precluded from advancing funds to closely related corporations, Stanton Corporation, 44 B.T.A. 56, notwithstanding, and that the determination of the taxpayer's officers and directors not to tap other possible sources of funds is entitled to weight, Crawford County Printing & Publishing Co., supra, in the absence of "a sinister or ulterior motive." No such motive has here been found. It is also to be noted that this is not a case where the taxpayer paid no dividends. Fairly substantial amounts of earnings were distributed in 1946 and 1948. None were paid in 1947, but even the Commissioner admits that 1947 was a "transitional" year for the taxpayer and that its earnings suffered. After carefully considering all of the facts of record we have found that the taxpayer was not availed of for the purpose of preventing the imposition of surtax upon its shareholders through *222 the medium of permitting earnings or profits to accumulate instead of being distributed and that such earnings or profits were not accumulated beyond the reasonable needs of the business. Accordingly, the surtax provided in section 102 was improperly imposed. Decision will be entered under Rule 50. Footnotes
*. For the purpose of the above tabulation, amounts due from officers and investments have been included in current assets, and amounts due the Holding Co. have been included in current liabilities.↩