FIRSTCO, INC., Plaintiff,

v.

UNITED STATES of America, Defendant.

Civ. A. No. J76–28(R).

United States District Court,
S. D. Mississippi,
Jackson Division.

April 27, 1977.

Leonard D. Van Slyke, Jr., Jackson, Miss., for plaintiff.

Robert E. Hauberg, U. S. Atty., Jackson, Miss., Jack D. Warren, Tax Div., U. S. Dept. of Justice, Washington, D. C., for defendant.

## OPINION

DAN M. RUSSELL, Jr., Chief Judge.

Firstco, Inc., a Mississippi corporation, with its principal place of business in Jackson, Mississippi, filed this suit for the recovery of federal income taxes for the tax years ending December 31, 1972 and December 31, 1973. This Court has jurisdiction by virtue of 28 U.S.C. Section 1346(a). Plaintiff alleges that it timely filed its tax return for the tax year 1972 and paid an income tax in the sum of $154,375.00. It similarly filed its tax return for the tax year 1973 and paid no income tax as none was due. On or about November 3, 1975, the District Director of International Revenue assessed plaintiff with additional income taxes in the sum of $36,297.85 for the

tax year 1972, and the sum of $13,551.73 for the tax year 1973. The additional taxes assessed for both years resulted from the imposition of an accumulated earnings tax pursuant to Section 531 of the Internal Revenue Code of 1954, 26 U.S.C. § 531.[1] Firstco promptly paid both assessments and filed a claim for a refund of each year's assessment on the following grounds:

"Taxpayer is not liable for the accumulated earnings tax as it was not formed or availed of for the purpose of avoiding the income tax with respect to its shareholders. Earnings were accumulated for the purpose of liquidating the interest of stockholders who wanted to redeem their shares, to provide for the repayment of outstanding loans and for other reasonable needs of the business including reasonably anticipated needs."

Upon disallowance by the Director of Firstco's claim for a refund for each of the tax years 1972 and 1973, Firstco filed its suit here alleging that the additional taxes were erroneously and illegally assessed and collected. Firstco seeks the recovery of the full sum of $49,849.58, being the total of the additional taxes assessed for the years 1972 and 1973, together with interest and costs.

Firstco claims that it was not formed or availed of for the purpose of avoiding any income tax with respect to its shareholders by permitting earnings and profits to accumulate instead of being divided and distributed,[2] nor to accumulate earnings and profits beyond the reasonable needs of its business.[3] Firstco asserts that it reserved its

---

1. SEC. 531. *Imposition of Accumulated Earnings Tax.*

 In addition to other taxes imposed by this chapter, there is hereby imposed for each taxable year on the accumulated taxable income (as defined in section 535) of every corporation described in section 532, an accumulated earnings tax equal to the sum of—
 (1) 27½ percent of the accumulated taxable income not in excess of $100,000, plus
 (2) 38½ percent of the accumulated taxable income in excess of $100,000.

2. SEC. 532. *Corporations subject to accumulated earnings tax.*

 (a) *General rule.*—The accumulated earnings tax imposed by section 531 shall apply to every corporation (other than those de-

scribed in subsection (b)) formed or availed of for the purpose of avoiding the income tax with respect to its shareholders or the shareholders of any other corporation, by permitting earnings and profits to accumulate instead of being divided or distributed.

3. SEC. 533. *Evidence of purpose to avoid income tax.*

 (a) *Unreasonable accumulation determinative of purpose.*—For purposes of section 532, the fact that the earnings and profits of a corporation are permitted to accumulate beyond the reasonable needs of the business shall be determinative of the purpose to avoid the income tax with respect to shareholders, unless the corporation by the preponderance of the evidence shall prove to the contrary.

earnings and profits from dividend distribution (1) for the redemption of stock from its shareholders, (2) for the repayment of business loans, and (3) in order to purchase new investments, the third reason being in addition to the reasonable or reasonably anticipated needs of its business as expressed in the claims for a refund.

The case was tried to the Court and is now ready for disposition.

Firstco was incorporated in May 1960, with an authorized capital stock of $500,000.00 consisting of 50,000 shares at $10.00 each. Although its charter listed a broad range of powers, according to its sole witness, Mr. John B. Tullos, president since 1974, Firstco was created as a morale builder for the employees of First National Bank of Jackson, Jackson, Mississippi, as a medium for permitting employees of the bank to pool their funds for the purchase of investments which would accrue to their benefit, a venture which very few FNB employees could have attempted on an individual basis. According to a pre-trial order entered herein, the corporation had as its business the buying and selling of stocks, the making of loans, and the operation of an insurance agency. Tullos added that capital appreciation was its goal. According to the original corporate by-laws, the ownership of stock was limited to full-time officers, employees, and directors of FNB, with a first option to the corporation to repurchase stock from a stockholder, within 30 days of his request, at net asset value as determined by the last quarterly evaluation. These bylaws also provided for dividends to be declared from the surplus or net profits at such times as the Board of Directors should direct and that no dividends be declared should such impair the capital of the corporation. In 1963 the by-laws were amended to limit ownership of stock to active and retired officers, employees and directors of FNB, and to provide that stockholders may sell their shares to other stockholders or to individuals eligible to become stockholders, and, if any stockholder should become ineligible for stock ownership through separation

from the bank's services by death or otherwise, he or his estate shall be required to sell the stock to another stockholder, or to an individual eligible for stock ownership, or to the corporation within 60 days of his ineligibility. A new method for determining the value of redeemed shares was provided for, the details of which are not material to the issues herein. Also, the amended by-laws provided that eligible individuals could acquire stock on an installment plan by depositing with the corporation monthly multiples of $10.00, up to $100.00, to be converted into shares at the end of each calendar year.

From its incorporation up to the date of the trial, Firstco has paid no dividends. Although the by-laws provide for a Board of Directors composed of seven members, according to Tullos, he and two other stockholders comprised the management for the corporation and made all investment decisions, and, from the inception of the corporation, it was a management decision not to distribute earnings in dividends, a decision accepted by the board and to which no stockholder has registered an objection. The corporation has never acted as an investment broker, although authorized under its charter to do so. Nor does it pay brokerage commissions, nor any salaries to its officers or its management group. Although Tullos, as a banker (Executive Vice-President and Cashier of FNB), said that he was aware that undistributed dividends created a tax savings to individual stockholders, he strenuously denied that the corporation was availed of for such a purpose or that the Board of Directors had such a tax savings in mind in its constant decision through the years not to declare dividends.

Evidence on behalf of Firstco showed that at the end of 1972 there were 62 shareholders owning a total of 19,583 shares of stock, and at the end of 1973 there were 55 shareholders owning 19,462 shares of stock. No one person owned as much as 10% of the stock in either of the two calendar years. Tullos testified that the obligation of Firstco to redeem shares subjected the corpo-

ration to a tremendous potential liability should a large number of shareholders request redemptions within any given period. Specifically the funds needed by Firstco to redeem all outstanding shares in 1972 was $2,313,927.20. This sum represented 19,583 shares at a redemption price of $118.16 per share, set by the Board of Directors. In 1973 Firstco would have had to have on hand $2,078,630.40, this to redeem 19,712 shares at a value of $105.45 per share.[4] Actually, according to Tullos, the 1972 redemptions amounted to only $140,861.07, and the 1973 redemptions to only $29,527.00. Nonetheless management did not consider it prudent to pay dividends in the absence of sufficient funds on hand to redeem all the shares.

Tullos also testified that the corporation initially borrowed huge sums of money, principally for two purposes—for the redemption of stock if it became necessary, and for the purchase of investments. Notes payable at the end of 1971 amounted to $2,167,000.00; at the end of 1972 they amounted to $1,910,000.00; and at the end of 1973, the second tax year involved, they amounted to $2,065,000.00. These notes were owed to two companies, Lamar Life Insurance Company, Jackson, and FNB.

They were demand notes, bearing interest, hopefully at a cost less than the investment earnings. Tullos admitted that no demand was ever made for payment. From time to time these notes were reduced, added to or renewed. According to Tullos, the management of Firstco did not consider it prudent to pay a dividend as long as these notes were outstanding. Although it has no bearing on the Court's ultimate decision herein, Tullos testified that these notes have now been paid.

As to the third item advanced by plaintiff as a reasonably anticipated business need, that is, the retention of sums with which to buy new investments, Tullos stated that the three members of the management group, himself, R. M. Hearin, and R. B. Lampton,[5] would decide timely investments to be made on behalf of Firstco. Funds for such investments came from funds on hand or borrowed funds. Tullos testified that the management group considered it necessary to retain from earnings the sum of $500,-000.00 during each of the tax years involved herein for investment purposes.

From monthly comparative financial statements relative to Firstco's cash on deposit during the tax years involved, Tullos reported as follows:

| 1972 | Cash on Deposit | 1973 | Cash on Deposit |
|------|-----------------|------|-----------------|
| 1/31 | $ 39,231.79 | 1/31 | ($287,267.12) |
| 2/29 | 37,790.52 | 2/28 | 4,488.31 |
| 3/29 | 40,548.78 | 3/30 | 19,645.05 |
| 4/30 | 39,159.01 | 4/30 | (19,078.75) |
| 5/31 | (4,957.27) | 5/31 | (37,433.50) |
| 6/30 | 6,865.93 | 6/30 | (211,258.51) |
| 7/31 | 29,636.33 | 7/25 | 20,268.58 |
| 8/31 | 31,394.28 | 8/31 | 22,126.14 |

4. An exhibit in evidence listing the stockholders and the number of shares owned by each in 1973 reflects that 250 of the total 19,712 shares represented capital treasury stock, and the total number of redemptive shares should have been reduced accordingly.

5. As well as being large shareholders and officers or directors of Firstco, Tullos, Hearin and Lampton are or have been executive officers of FNB.

| 1972 | Cash on Deposit | 1973 | Cash on Deposit |
|------|-----------------|------|-----------------|
| 9/30 | 45,354.98 | 9/30 | 42,940.64 |
| 10/31 | 59,519.38 | 10/31 | 2,139.94 |
| 11/30 | (20,852.62) | 11/30 | 2,355.15 |
| 12/31 | (303,016.49) | 12/31 | 11,091.99 |

These figures were offered to show that never at any time during the years 1972 and 1973 was there sufficient cash on deposit from which to pay a sizeable dividend. In explanation of the overdrafts, Tullos said that Firstco had an arrangement with FNB to permit temporary overdrafts, FNB having reason to know that the overdrafts would be promptly cleared.

Until it was called to his attention in his deposition taken approximately three months before trial, Tullos, although he signed the 1972 and 1973 tax returns on behalf of Firstco, was not aware that in the 1972 return the amount of $698,252.00 appeared in Schedule L, Item 6, as "loans to stockholders" at the end of the taxable year, and in the 1973 return, the sum of $250,000 was shown as "loans to stockholders" at the end of the 1973 tax year. He stated that these sums properly represented the sum of notes receivable or debts owed to Firstco and did not represent loans to shareholders. He stated that the major portion of these amounts represented stock purchases made by him and Mr. Hearin on behalf of Firstco. The procedure, as he explained it, was that he, as nominee for Firstco, purchased 5000 shares of stock in Intersystems, Inc., as an investment for Firstco. He borrowed the money to make the purchase from Firstco, giving Firstco his note with the stock as security. Upon receipt of the stock certificate, Tullos assigned same to Firstco, and, in return, his note was cancelled. Similarly, Hearin bought stock in another company as nominee for Firstco, and when the transaction was completed, his note was cancelled. Any amount exceeding the total price of these stocks, represented notes receivable, not from stockholders, but from purchasers of investments held by Firstco. The explanation of "loans to stockholders", in each return, is important only insofar as the IRS agent, who audited the returns, was misled into thinking that these sums represented personal loans to shareholders or the expenditure of funds by the corporation for the personal benefit of the shareholders.[6] The Court accepts the explanation offered by Mr. Tullos and finds that the aforesaid amounts listed in the 1972–1973 tax returns were erroneously labeled "loans to stockholders", whereas actually they were not.

Plaintiff, in its post-trial brief, is critical of the auditing agent who determined that none of the earnings and profits of Firstco during the two tax years involved should have been retained for (1) redemption of stock; (2) to pay off more than $2,000,000.00 in loans, and (3) to make additional investments, although the agent was aware that stock was being redeemed every year, that large notes were outstanding, that there was a large overdraft at the end of 1972 and that only $11,092.00 was on hand at the end of the 1973 year. Also, as to the corporate intent to avoid income taxes for its shareholders by permitting earnings to accumulate instead of being distributed, out

6. Treasury Regulations on Income Tax (1954 Code) (26 C.F.R.), Section 1.533–1. *Evidence of purpose to avoid income tax.* Under (a) circumstances which might be construed as evidence of the purpose to avoid income tax with respect to shareholders includes (1) dealings between the corporation and its shareholders, such as withdrawals by the shareholders as personal loans or the expenditure of funds by the corporation for the personal benefit of the shareholders.

of the 55 to 62 shareholders of record during the two tax years, the agent interviewed only one, Tullos, who was adamant that such an intent was not present or considered. Plaintiff, by way of its brief, also complains that the agent refused to make an allowance against earnings and profits for the payment of $172,375.00 federal income taxes paid with the 1972 tax return. Plaintiff concedes that, had there been a distribution of dividends in 1972 and 1973, more income taxes would have been paid by shareholders on whose increased income the tax would have fallen. However, plaintiff insists that this fact has no legal significance inasmuch as the statute requires that there be an intent or purpose to avoid the imposition of additional income taxes with respect to the shareholders, proof of which is lacking herein in view of the denials of such intent by Tullos, the only shareholder interviewed by IRS. In this connection, plaintiff claims that it is not a "mere" holding or investment company within the provisions of 26 U.S.C. Section 533(b), which provides that the fact that a corporation is a mere holding or investment company shall be prima facie evidence of the purpose to avoid the income tax with respect to shareholders, citing *Battelstein Investment Co. v. U. S.*, D.C., 302 F.Supp. 320. Finally, plaintiff contends that the accumulated earnings tax is simply not applicable to a corporation with more than 50 shareholders, citing *Golconda Mining Corporation v. Commissioner of Internal Revenue*, 9 Cir., 507 F.2d 594, which held that the accumulated earnings tax has no application to a "publicly held" corporation. As to this the Court notes that the court in *Golconda* cited with approval the following from *U. S. v. Donruss Co.*, 393 U.S. 297, 310, 89 S.Ct. 501, 508, 21 L.Ed.2d 495: "In practice, the accumulated earnings provisions are applied only to closely held corporations, controlled by relatively few shareholders."

 Tullos testified, and the exhibits in evidence support his statement, that all of Firstco's earnings and income came from investments, that is capital gains from the sale of investments, dividends, and interest.

Firstco also participated with FNB in a large mortgage loan, earning a share of the interest thereon, and received the profits from an insurance agency operated by employees of the Bank of Wesson, Wesson, Mississippi. As to the latter the profits which inured to Firstco were the commissions from insurance sales, less a fixed management fee to the employees who managed the agency. These profits are reflected on Firstco's monthly comparative statements for the period December 31, 1971 through December 31, 1973 as an investment. Considering that all earnings were derived from investments, the fact that Firstco operates from premises leased from FNB and has no capital outlay for housing, inventory or such like matters that have been held to be reasonable business needs, the Court finds that Firstco is a mere holding or investment company within the meaning of Section 533(b), a fact that presumptively establishes its intent to avoid income taxes with respect to its shareholders. The Court also finds that Firstco is not a publicly held corporation, which although not exempted by statute from the accumulated earnings tax, has never historically been held subject thereto. See *Golconda*, supra. To the contrary, Firstco has none of the trappings of a corporation which offers its stock to the general public. By its bylaws, as amended, ownership of stock is strictly limited to active and retired officers, employees and directors of FNB, who, in turn cannot sell any stock except to those eligible for stock ownership or to the corporation.

The government's only live witness was Perry W. Smith, the agent who audited Firstco's tax returns. From information appearing in Firstco's tax returns, he prepared a summary of income earned during the tax years 1968 through 1973. At the end of 1971, Firstco had earned income in the sum of $622,544.00. At the end of 1972, Firstco had additional earned income in the sum of $474,028.00. With an adjustment of $117,787.00 for the redemption of stock and other adjustments, not otherwise identified, this sum of $474,028.00 was reduced to

$356,241.00, which when added to the 1971 surplus, amounted to $978,785.00 at the end of 1972. The earned surplus increased to $1,053,421.00 at the end of 1973. Although Firstco received less income in 1973 as compared to its successful growth in prior years, it has paid no dividends from its inception up through 1973. Its portfolio of investments, according to Firstco's comparative statement for the month ending December 31, 1971, had a net market or distributable value of $3,500,049.68. Tullos defined "net distributable value" as the total fair market value of the investments, less anticipated federal or state capital gains taxes. At the end of 1973, the net distributable value of the investments was $3,532,310.75, as reflected on Firstco's comparative statement for the month ending December 31, 1973. In the absence of the distribution of dividends, it is obvious that the only time any individual shareholder would pay any income tax would be upon the capital gains, if any, realized from the sale of his stock to another shareholder, or to one eligible to be a shareholder, or, in the event his stock was redeemed by Firstco, in which case a capital gains tax would be applicable rather than a tax on ordinary income. Tullos conceded this to be true.

Turning again to Agent Smith's testimony, from a list of stockholders showing the number of shares owned by each, furnished by Firstco, he computed the percentage of ownership of shares held by the eleven largest shareholders, and, by simple mathematics, determined that in 1972, these eleven, 17% of the total number of shareholders, owned 71.23% of the stock, and that in 1973, the same eleven, being 20% of all the shareholders, owned 75.01% of the stock. Tullos, Hearin, and Lampton, the three shareholders who controlled and managed the investments, were among these eleven. In another chart prepared by Smith, again comprising simple mathematical computations from information supplied by Firstco, he took the earned income for the years 1972 and 1973 and applied the percentage of ownership of seven of the largest stockholders, who again included the management team, to arrive at the amount of income that would have insured to each of them had all earned income been distributed in the form of dividends. These seven owned 52.78% of the corporate stock in 1972 and 56% in 1973. In another exhibit he computed the income taxes actually avoided by these seven shareholders during the tax years 1972 and 1973 by reason of the failure of the corporation to distribute corporate earnings. Because these computations were necessarily arrived at in conjunction with these stockholders' individual tax returns, the Court, over plaintiff's strenuous objection, received this exhibit for inspection in camera. The total of the income taxes avoided by the same seven stockholders amounted to $124,759.92 in 1972 and $15,539.62 in 1973. Summarizing Smith's treatment of accumulated earnings, he considered that all of the earnings and profits acquired in each of the tax years 1972 and 1973, none of which was distributed as dividends, were subject to the accumulated earnings tax imposed during 1972 and 1973 by virtue of 26 U.S.C. Section 531. He did not allow any amount in either year for the corporate redemption of stock, or to pay off loans of approximately $2,000,-000.00, or any sum for the purchase of new or additional investments, or a reserve for the payment of corporate income taxes for the tax year of 1972, none being owed for 1973, on the basis that any of these items were reasonable or reasonably anticipated business needs. It was his opinion that the corporation was formed or availed of for the purpose of avoiding the income tax with respect to its shareholders by permitting earnings and profits to accumulate instead of being divided or distributed in violation of Section 532(a). He based this opinion on the fact that, despite the tremendous success of the corporation in accumulating growth stock, dividends and interest, it had never paid a dividend, nor a salary to any officer or director, and it did not appear to him that an individual qualified to buy stock would do so with no intention of getting anything back on his investment.

The purpose of the accumulated earnings tax is "to compel the company to distribute any profits not needed for the

conduct of its business so that, when so distributed, individual stockholders will become liable" for taxes on dividends received. *U. S. v. Donruss Co.*, 393 U.S. 297, 303, 89 S.Ct. 501, 505, 21 L.Ed.2d 495, quoting from *Helvering v. Stock Yard Co.*, 318 U.S. 693, 699, 63 S.Ct. 843, 87 L.Ed. 1086. Section 533(a) provides that the fact that the earnings and profits of a corporation are permitted to accumulate beyond the reasonable needs of the business shall be determinative of the purpose to avoid the income tax with respect to shareholders, unless the corporation by the preponderance of the evidence shall prove to the contrary. Section 533(b) states that the fact that any corporation is a mere holding or investment company shall be prima facie evidence of the purpose to avoid the income tax with respect to shareholders. Although the Court has found that Firstco is a mere investment company by reason of the fact that all its earnings and profits come from investments and is thus faced with the presumption under Section 533(b) that it has been used to avoid income taxes with respect to its shareholders, even if the Court be in error in this finding, the ultimate burden of proving lack of intent is on Firstco. The forbidden purpose need not be the sole, primary or dominant purpose, but may be one of the underlying purposes. *Hardin v. U. S.*, 5 Cir., 461 F.2d 865, and *U. S. v. Donruss Co.*, supra. In determining the corporation's intent, the Court necessarily looks to those officers or directors responsible for the corporate acts. Here, Firstco's by-laws provided for the distribution of dividends, if doing so would not impair the corporate capital. The three-member management team, with the apparent consent of the Board of Directors, determined that no dividends would be distributed despite sufficient earnings during 1972 and 1973 with which to do so. Firstco now claims those earnings were necessary for business needs. In the absence of convincing proof of the claimed business needs, dealt with hereinafter, the fact that earnings were not distributed is an indication of the illegal motive, when considered with the fact that the shareholders would have had to pay additional taxes if dividends had been declared, and which was admittedly known to management. *Helvering v. National Grocery Co.*, 304 U.S. 282, 58 S.Ct. 932, 82 L.Ed. 1346, and *American Metal Products Corp. v. C. I. R.*, 8 Cir., 287 F.2d 860. Nor do denials that the proscribed purpose existed control. *Helvering v. Chicago Stock Yards, Co.*, 318 U.S. 693, 63 S.Ct. 843, 87 L.Ed. 1086. Further the controlling intention is that which is manifested at the time of the accumulations not subsequently declared intentions or the product of after thought. *Schenuit Rubber Co. v. U. S.*, D.C., 293 F.Supp. 280, and *Smoot Sand & Gravel Corp. v. Commissioner of Internal Revenue*, 4 Cir., 241 F.2d 197, 202, after remand, 4 Cir., 274 F.2d 495.

■ If Firstco failed to offer convincing proof that its accumulated earnings were necessary for reasonable business needs or reasonably anticipated business needs,[7] the accumulations themselves establish the prohibited purpose. *American Metal Products Corp. v. C. I. R.*, supra.

■ Turning to the business needs claimed by Firstco, it was Firstco's burden to prove that it had specific, definite and feasible plans for the accumulations. See *Dixie, Inc. v. Commissioner of Internal Revenue*, 277 F.2d 526, wherein the Second Circuit of Appeals said:

> "In order to justify an accumulation as reasonable to meet a business need the need must be treated with economic reality . . . Definiteness of plan coupled with action taken toward its consummation are essentials."

■ Also see Treasury Regulations on Income Tax, Section 1.537–1(b), which states in part that in order for a corporation to justify an accumulation of earnings and profits for reasonably anticipated future needs, there must be an indication that the future needs of the business require such accumulation, and the corporation must have specific, definite, and feasible plans

---

7. See 26 U.S.C. Section 537(a)(1).

for the use of such accumulation. Nor may retained earnings be justified merely for the purpose of providing for some theoretical contingency or bare possibilities. *Hardin v. U. S.*, 5 Cir., 461 F.2d 865, and *Simons-Eastern Co. v. U. S.*, D.C., 354 F.Supp. 1003. Nor to provide against unrealistic hazards. See Treas.Reg., # 1.537–2(c)(5).

 Other than providing in its by-laws a limited manner in which shareholders could divest themselves of stock, including redemption by the corporation, none of the minutes of the corporation in evidence reflect a plan for the redemption of stock. There is no evidence that a reserve was established for this contingency. According to Tullos the management felt that Firstco should be prepared to redeem all stock at any one time, yet, during the tax years in question or prior thereto, no concrete plans were formulated for such an eventuality. Tullos readily conceded that there were no dissident stockholders. Redemptions did occur during both tax years. However, according to the comparative financial statements these redemptions were obviously made from accumulated earnings, no funds having been set aside for this purpose. Where the evidence shows that the redemption of stock is for the benefit of the corporation, such may be a legitimate business purpose. *Mountain State Steel Foundries, Inc. v. Commissioner of Internal Revenue*, 4 Cir., 284 F.2d 737. But, in the absence of disharmony or dissenting minority stockholders, stock redemptions are normally for the benefit of stockholders and not a business need of the corporation. *Pelton Steel Casting Co. v. Commissioner of Internal Revenue*, 7 Cir., 251 F.2d 278, cert. den. 356 U.S. 958, 78 S.Ct. 995, 2 L.Ed.2d 1066. Further, Firstco was required to take into account the availability of future earnings and profits which could be used for this purpose, as it obviously did with respect to the redemption of stock, as well as in the payment of its loans. *Battelstein Investment Co. v. U. S.*, 5 Cir., 442 F.2d 87.

As to the repayment of its loans in approximately the amount of $2,000,000, Firstco, speaking through Tullos, did not during the tax years involved, or before, have any definite plan for doing so. In fact it did not need such a plan as Tullos frankly conceded no demand had been made on Firstco by either creditor, and he expected none. Tullos, in responding to government questioning, stated that it was the intent of the management officials to reduce and pay off the notes as soon as possible out of earnings or from the sale of securities.

Similarly, management officials demonstrated no definite plan to set aside or reserve from accumulated earnings the sum of $500,000.00 for new or additional investments. Unlike a manufacturing company which is entitled to set aside as reasonable business needs earnings for new machinery or for materials used in increasing its production, Firstco is in the business of anticipating the market in securities in order to increase the value of its product, that is, the acquisition of growth stock, which is its primary goal. It could have attempted to set aside a reserve or earmark $500,000.00 for this purpose as a reasonable business need. It did not in fact do so during the tax years involved or prior thereto.

Although not pertaining to an investment company, it was said in *Cheyenne Newspapers, Inc. v. C. I. R.*, 10 Cir., 494 F.2d 429, 435 that investments in marketable securities which bear some relationship to a corporation's business usually are considered a proper business application of funds and may be accumulated with impunity. At the same time that court said that marketable securities held for investment purposes are not afforded the same status. "Such a policy would allow a corporation to avoid an accumulated earnings tax merely by investing all excess cash in marketable securities, a result contrary to the accumulated earnings tax provisions. Instead, such securities must be considered part of a corporation's liquid assets in arriving at the figure a corporation must justify retaining. (Citations) . . . Indeed, the treasury regulations [Treas.Reg. # 1.533–1(a)(2)(ii) and # 1.537–2(c)(4)] apparently regard the presence of marketable securities among a

corporation's assets as affirmative evidence of the avoidance purpose." (at page 435).

 To the extent that the increase in market value over the cost of the investments must be considered as a part of the accumulated earnings at the time such earnings are set aside for business needs, depends, in great part, on the liquidity of the investments, which is not the issue here. See *Ivan Allen Co. v. U. S.*, 422 U.S. 617, 95 S.Ct. 2501, 45 L.Ed.2d 435. Neither Firstco nor the government has cited a case involving whether or not a mere investment company, or one primarily engaged in making investments, may validly deduct from its accumulated earnings, which under Ivan Allen Co. includes the net realizable value of its readily marketable securities, any fixed amount for new or additional investments as a reasonable business need. Nor has the Court's research located any cases precisely in point. Nonetheless, as the Court now construes the law, a corporation, such as Firstco, has an almost insuperable burden to overcome in establishing as a business need the necessity to reserve large amounts from its accumulated earnings for the acquisition of new or additional investments. If the fact that its investments, which have enhanced in value, are not readily marketable, no such evidence was presented to the Court, and, in any event, Firstco failed to support its claim with any specific justification.

The following language in *Trico Products Corp. v. McGowan*, D.C., 67 F.Supp. 311, 325, aff'd, 2 Cir., 169 F.2d 343, is pertinent here.

"The fact that the taxed surplus for the calendar years 1936 and 1937 was accumulated beyond the reasonable needs of plaintiff's business and the further fact that plaintiff's six largest stockholders, who were wealthy men, saved a large federal income tax that would have been imposed upon them had the taxed surplus been distributed, is evidence enough to uphold the taxes in question."

 The Court finds that Firstco has failed to establish that the accumulated earnings subjected to the accumulated earnings tax for the years 1972 and 1973 were necessary for reasonable business needs or reasonably anticipated business needs and has failed to establish that it was free of any motive or intent to avoid an income tax with respect to its shareholders. The Court, accordingly, finds that the suit should be dismissed.

An appropriate order may be submitted with court costs taxed to the plaintiff.